**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 29, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHIRLEY A. GRAHAM,

      Plaintiff-Appellant,

v.

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY,

      Defendant-Appellee.

No. 09-5043

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:03-CV-00144-E)**

---

Joseph F. Clark, Jr., Clark & Warzynski, P.A., Tulsa, Oklahoma, for Plaintiff-Appellant.

Timothy A. Carney, (Erin K. Dailey with him on the brief) Gable & Gotwals, Tulsa, Oklahoma, for Defendant-Appellee.

---

Before **BRISCOE, McKAY,** and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

      Plaintiff-Appellant Shirley Graham appeals the district court's adjudication

of her claim for disability benefits under the Employee Retirement Income

Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. She raises three issues on appeal: (1) whether the district court properly determined that her disability benefits plan with Defendant-Appellee Hartford Life & Accident Insurance Co. ("Hartford") did not qualify as a "governmental plan" pursuant to 29 U.S.C. § 1002(32); (2) whether the district court properly determined that Graham was not entitled to a jury trial on her claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B); and (3) whether the district court properly determined that Hartford's ultimate denial of disability benefits was not arbitrary and capricious. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

I

From November 1976 until July 2000, Graham was an employee with the United States Postal Service ("USPS"). Administrative Record ("A.R.") at 544. She began her career as a Rural Letter Carrier, but due to physical health problems the USPS changed her position on June 7, 1997 to Modified Rural Carrier, a sedentary desk job that required intermittent walking, standing, and lifting. Id. at 196-97. Increased knee and ankle pain caused Graham to take a leave of absence on July 17, 2000 under the Family and Medical Leave Act. Id. at 496-99. The United States Office of Personnel Management ("OPM") granted her disability retirement on December 1, 2000. Id. at 453-54.

*The Plan*

The National Rural Letter Carriers Association ("NRLCA"), recognized by

2

the USPS as the exclusive bargaining representative for rural letter carriers,

offered its members a long term disability income protection plan. R. at 109-10.

Although the NRLCA and USPS entered into a collective bargaining agreement,

that agreement did not require the USPS to provide rural letter carriers with

disability benefits. Id. at 271-72. To that end, the NRLCA contracted separately

with Hartford to provide such a plan. It announced the plan to its members in the

following letter:

> Dear Member:
>       The [NRLCA] is pleased to offer a long term disability income protection plan for its regular rural carrier (Designation 71) members.
>       . . . Postal employees do not have a long term disability plan that is sponsored by the [USPS]. So, the NRLCA has worked diligently over the past several years to develop and sponsor a disability income plan for its regular carrier members.
>       . . .
>       The Plan is sponsored by the NRLCA and underwritten by [Hartford].

Id. at 109. The accompanying brochure indicated that the plan was

"[u]nderwritten by" Hartford and "[a]rranged and [a]dministered by" the

NRLCA's Group Insurance Department. Id. at 118. Though participation in the

plan was completely voluntary, the brochure indicated that enrollment was

available "only through government allotment."[1] Id. at 116. To request coverage,

---

[1] Although the brochure did not define "government allotment," it explained that to enroll in the plan, employees needed to complete direct deposit paperwork that would enable enrolled employees' "direct deposit premium

(continued...)

3

participating members needed to authorize the USPS to "make the appropriate deductions from [their] wages" and to release any information, including salary information, necessary for enrollment in and administration of the plan. Id. at 120. The Certificate of Insurance declared the NRLCA to be the policyholder, Hartford the issuer, and the USPS the employer. Id. at 126-27. Graham enrolled in the plan on January 28, 1997. A.R. at 489.

Pursuant to the terms of the plan, disability benefits become payable if:

1. you become Totally Disabled while insured under this plan;
2. you are Totally Disabled throughout the Elimination Period;
3. you remain Totally Disabled beyond the Elimination Period;
4. you are, and have been during the Elimination Period, under the Regular Care of a Physician; and
5. you submit Proof of Loss satisfactory to us.

Id. at 105. Under the plan, "Totally Disabled" means that

1. during the Elimination Period; and
2. for the next 24 month(s), you are prevented by:
   a) accidental bodily injury;
   b) sickness;
   c) Mental Illness;
   d) Substance Abuse; or
   e) pregnancy,
   from performing the Essential Duties of Your Occupation, and as a result you are earning less than 20% of your Predisability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

---

[1](...continued)
payments [to] be deducted from [their] paycheck[s]." R. at 106.

4

Id. at 116.  The plan defines Elimination Period as the "period of time you must be Totally Disabled before benefits become payable."  Id. at 102.  The parties do not dispute that given the coverage option Graham selected, her Elimination Period started on July 16, 2000 and lasted until October 14, 2000.

Combining all these elements together, the essential question concerning Graham's entitlement to disability benefits is whether an accidental bodily injury prevented her from performing the Essential Duties[2] of her occupation from July 16, 2000 until October 14, 2000.

*Medical History*

When Graham began experiencing physical health problems, she became a patient of Dr. T. Jeffrey Emel, M.D., a doctor associated with the Eastern Oklahoma Orthopedic Center, Inc. ("Orthopedic Center").  On February 7, 1994, Graham twisted her right knee while delivering mail.  Id. at 227.  She injured that knee again the following month, and underwent surgery in July 1994.  Id.  Her knee pain persisted and she underwent another procedure in March 1997.  Id.  On April 18, 1997, a member of the Orthopedic Center wrote a letter to the United States Department of Labor's Office of Workers' Compensation Programs ("OWCP").  The letter recommended Graham for "sedentary work endeavors:" Graham "need[ed] to be primarily off her feet for the most part," and should be

---

[2] The plan defines "Essential Duty" as a duty that (1) "is substantial, not incidental;" (2) "is fundamental or inherent to the occupation; and" (3) "cannot be reasonably omitted or changed."  A.R. at 114.

permanently restricted from "carrying mail" or "working up on her feet for any significant periods of time." Id. at 226. The USPS responded by moving Graham into a Modified Rural Carrier position on June 7, 1997. Id. at 196-97.

On October 25, 1998, Graham injured her left foot and ankle at home. Id. at 229-30. Dr. Emel diagnosed her with a "[g]rade 1+ deltoid sprain with lateral ankle sprain as well." Id. at 230. By November 1998, Graham was "making progress with her ankle." Id. at 232.

Graham experienced knee and ankle pain throughout 1999 and early 2000. By early 2000, however, her medical records indicate that her treatment had reduced the pain she was experiencing in both her ankle and knee. Although Graham's right knee was "symptomatic" in March 1999, id. at 233, and had "flared up again" in May 1999, id. at 234, Graham received an injection of corticosteroid and three injections of Synvisc in her right knee in November and December 1999, id. at 238-41. On January 11, 2000, Dr. Emel reported to the OWCP that the Synvisc injections provided "good relief;" by that point, Graham had "no swelling and actually the knee pain [was] significantly decreased." Id. at 242.

Graham's left ankle began "flar[ing] up" in August 1999. Id. at 235. Despite some improvements in September, Dr. Emel noted in October that Graham's ankle was "still swollen but becomes even more swollen and symptomatic if she is not taking her Vioxx." Id. at 236-37. When Graham's

6

ankle was "still causing her pain" on January 11, 2000, Dr. Emel ordered an MRI, which revealed a "ganglion cyst." Id. at 243, 248-49. Graham underwent cyst removal and biopsy surgery in late February 2000. Id. at 257. Her follow-up evaluation on March 21, 2000 indicated that Graham "overall [was] doing significantly better in terms of her former discomfort." Id. at 260. In addition, the operating physician had indicated in his consultation notes that Graham would likely be able to return to work within weeks after this procedure. Id. at 249.

Graham's leave of absence commenced on July 17, 2000. Although Dr. Emel indicated in her Family and Medical Leave Act paperwork that Graham suffered from "ankle osteophytes, bone cyst, [and] osteoarthritis knees & ankles," id. at 497, the administrative record does not contain any other description of the change in Graham's condition after her March 21, 2000 follow-up evaluation. With respect to the Elimination Period and shortly thereafter, the administrative record reveals the following documentation:

- On July 26, 2000, Dr. Emel reported to the OWCP that Graham experienced "irritation in her knee." Noting that Graham's ankle surgery "caused her to have to bear more weight on the knee," and that "[h]er ambulation at work seems to exacerbate all this," Dr. Emel gave Graham's knee an injection and noted to check her after two weeks. Id. at 259.

- On July 28, 2000, Graham's ankle was "still having quite a bit of swelling." Dr. Emel gave Graham an injection and noted to check her after two weeks. Id. at 263.

- On August 10, 2000, Graham's ankle and knee had both "improved." Id. at 264-65. Dr. Emel suggested continuing Synvisc injections for her knee because "she does get good relief from that." Id. at 265.

7

- Graham received three more Synvisc injections on August 30, September 7, and September 15.  Id. at 266-68.

- On October 13, 2000, Dr. Emel reported to the OWCP that Graham was "only minimally improved.  The Synvisc [had] some sort of flare reaction after the last injection, although that subsided."  Id. at 269.  Dr. Emel continued her medication and treatment for a month.

- On November 10, 2000, Dr. Emel reported that Graham was "about the same.  She is still not ready to return to work yet."  Graham's knee was "hurting" despite the injections.  Id. at 270.

- On November 15, 2000, Dr. Emel noted that Graham's "left ankle and left knee [were] both acting up."  Id. at 271.  X-rays revealed that the ankle joint "actually look[ed] pretty good," and Dr. Emel gave her ankle an injection.  Id.

- On December 5, 2000, Dr. Emel noted that Graham received "good relief" with her left knee pain, but her left ankle "did not respond quite as well."  Id. at 272.  He noted that "[s]he is still not in a position where she can work."  Id.

- On December 12, 2000, Dr. Emel reported to the OWCP that Graham's right knee was "still giving her problems but it has calmed down now."  Id. at 273.  He concluded that "[s]he is still temporarily totally disabled."  Id.

- On January 8, 2001, Dr. Emel reported to the OWCP that Graham "started having more severe pain" with her right knee.  His impression was that Graham had "[d]egenerative joint disease" in her right knee.  Id. at 471.

*Procedural History*

As stated earlier, the USPS reassigned Graham to a Modified Rural Carrier position on June 7, 1997.  The position involved "[g]eneral clerical work for [the] Maintenance Department[,] [s]imple filing, answering phones, occasional simple computer use, completion of reports, and other duties as assigned within

8

documented restrictions." Id. at 196. The physical requirements were "2 hours each intermittent walk/stand. 1 hour intermittent lift up to 10 lbs. No climb, kneel, twist. Minimal intermittent bend/squat. No push/pull. Sedentary work." Id. Because Graham maintained this position for at least six months prior to her leave of absence, Hartford concluded that it qualified as her "occupation" for determining her eligibility for long term disability benefits. Id. at 1, 475.

Graham applied for disability retirement with the USPS on July 25, 2000. Id. at 575. On July 26, 2000, Dr. Emel wrote to the OWCP, recommending Graham for disability retirement:

> At this point, Mrs. Graham has significant osteoarthritis involving both knees and both ankles. An ambulatory job would be counterproductive for her. She has been on special duty for the last several years. She has given almost 25 years of continuous service to the Postal Service and I really do not think she will be able to continue her work capacities . . . .

Id. at 261-62. The OPM granted Graham disability retirement on December 1, 2000. Id. at 557-58.

Graham applied for disability benefits under the NRLCA plan on October 27, 2000. Id. at 579, 584. As part of its evaluation, Hartford asked the USPS to complete a Physical Demands Analysis Form. Id. at 537. A human resources specialist indicated on the form that "[in] an 8 hour workday, an individual in [the Modified Rural Carrier] position must" sit for eight hours, intermittently stand for two hours (with rest), and intermittently walk for two hours (with rest). Id.

9

Hartford also asked Dr. Emel to complete a Physical Capacities Evaluation Form. When Dr. Emel first completed the form on December 15, 2000, he indicated that Graham could only sit for two hours a day and drive for one hour a day. In total, he indicated that Graham could only work a daily maximum of three hours. Id. at 531. When Dr. Emel completed the form again on December 28, 2000, he indicated that Graham could sit for one hour at a time, for a total of four total hours per day, and Graham could drive for one hour a day. In total, Dr. Emel indicated that Graham could work a daily maximum of four hours. Id. at 514-15.

As a follow-up to these forms, Hartford faxed Dr. Emel the following clarification: "How do [Graham's] conditions of 'ankle osteophytes' and 'osteoarthritis of both knees and ankles' affect her ability to perform a sedentary occupation? Please describe how these conditions affect her ability to sit." Id. at 480. On January 23, 2001, Dr. Emel responded with "no it does not but patient has retired." Id. at 479-80. Principally relying on this follow-up, Hartford denied Graham's claim for benefits on February 28, 2001. Id. at 18.

On April 9, 2001, Graham appealed the denial through Hartford's administrative appeal process. Id. at 447. As part of her appeal, Graham submitted a March 7, 2001 letter from Dr. Emel, which reported that a recent MRI of Graham's left knee revealed "severe chondromalacia of the patellofemoral mechanism." Id. at 448. In Dr. Emel's opinion, this "explain[ed] why any

10

prolonged sitting cause[d] [Graham] a great amount of pain and discomfort," and why Graham "cannot continue to work even at her job at the post office since she cannot drive for an hour and really should not sit for more than an hour at any one time." Id. Hartford denied her appeal because Graham's sedentary position was flexible enough to allow her to "stand or walk as needed." Id. at 442-44. Graham appealed again on September 26, 2001, asking Hartford to "review ALL the information," and claiming that her injuries caused sleeping problems. Id. at 439-40. Hartford denied her appeal again because Graham provided no medical evidence of a sleep disorder and none of her medical records evidenced the severity of pain she claimed to experience. Id. at 388-90. Graham appealed again on February, 21, 2003, but Hartford denied that appeal because she had exhausted the plan's administrative remedies. Id. at 350.

Graham brought suit against Hartford in the United States District Court for the Northern District of Oklahoma, asserting a state law claim for breach of the duty of good faith and fair dealing. On April 22, 2005, the district court concluded that the NRLCA disability benefits plan did not qualify for ERISA's "governmental plan" exemption. As a result, ERISA preempted Graham's state law claim, and Graham was restricted to pursuing a claim for benefits under 29 U.S.C. § 1132(a). After reviewing Graham's administrative record, the district court concluded that Hartford's denial of disability benefits was arbitrary and capricious, and remanded the case to the plan administrator for a full and fair

11

determination of her claim. Graham appealed, but we dismissed her appeal for lack of appellate jurisdiction. Graham v. Hartford Life & Accident Ins. Co., 501 F.3d 1153, 1154 (10th Cir. 2007); cert. denied, 128 S. Ct. 1650 (2008).

On remand, Hartford retained Dr. Stephen A. Silver, M.D., a board certified orthopedic surgeon, to examine Graham's medical records to define her "functional limitations" both during and beyond the Elimination Period (July 16, 2000 through October 14, 2000). A.R. at 170. In his report, Dr. Silver summarized the records that he reviewed, and reported that he spoke to Dr. Emel about Graham's condition. Dr. Emel indicated that Graham "can sit for an unlimited period of time but can stand for no longer than approximately 15 minutes and [can] walk for no more than 15 minutes. He feels that she cannot lift anything more than 10 lbs. due to a problem with respect to her back." Id. at 174. After reciting Dr. Emel's opinion, Dr. Silver then reached the following conclusion with respect to Graham's physical limitations:

> It is my opinion that based on the information provided that Shirley Graham [was] capable of sedentary level activity from 7-16-00 to 10-14-00 where she can sit for unlimited periods of time and lift up to 10 lbs. It is my opinion she can perform some form of ambulation around her office for approximately 15 to 20 minutes as noted by Dr. Emel. She can engage in fine manipulation with respect to her hands. In summary, it is my opinion that both the information provided as well as conversation with Dr. Emel bear out this woman having a capacity for sedentary work from 7-16-00 to 10-14-00 and beyond.

Id. at 174.

12

In response to this report, Hartford asked Dr. Silver three clarifying questions. First, Hartford asked if Dr. Emel's opinion specifically addressed Graham's limitations during the Elimination Period. Id. at 162. Dr. Silver responded that when he spoke with Dr. Emel he was "not sure [Dr. Emel] remembered 8 years earlier. He did not go back thru the medical records." When Dr. Silver again contacted Dr. Emel for further clarification, Dr. Emel said that although Graham "was 50lbs heavier at that time," Dr. Emel "felt the restrictions would probably be the same but did not elaborate." Id.

Second, in light of the conflicting Physical Capacities Evaluation Forms that Dr. Emel had previously completed, Hartford asked if Dr. Emel agreed that during the Elimination Period Graham could sit "most of the time in an 8 hour day if she could change positions whenever necessary." Id. at 162. Dr. Silver's answer was "see [answer] #1." Id. at 163.

Third, Hartford asked Dr. Silver to clarify his conclusion that Graham could perform ambulatory activity for approximately 15-20 minutes a day. Id. Dr. Silver responded that "Dr. Emel feels the claimant can sit for 8 hours a day and stand/walk [for] 15-30 minutes 3 to 4 times daily but not on a frequent basis. I concur with Dr. Emel on this." Id.

Hartford again denied Graham disability benefits on July 24, 2008. Id. at 1-9. Hartford concluded that after reviewing the documents in the claim file, obtaining independent physician review, and further consulting with Dr. Emel, "it

13

appears that for the period 7/16/00 through 10/14/00 Ms. Graham was functionally capable of performing the duties of her sedentary occupation of Modified Rural Carrier." Id. at 9. Hartford's denial letter reflects that it considered two additional pieces of correspondence from Dr. Emel that are pertinent to this appeal. The first is an August 1, 2002 letter, purportedly authored by Dr. Emel,[3] that explains that Graham "is really not capable of doing even sedentary work for long periods of time. Her knees are rapidly deteriorating and will require a total joint arthroplasty probably in the next three to five years." Id. at 275. The letter further stated "[t]here is no gainful employment for her to do at the post office." Id. The second is a January 28, 2004 letter from Dr. Emel, explaining that Graham had suffered metatarsal fractures in her feet, and opining that Graham "has been unemployable for the last 2-3 years at least." Id. at 277.

Graham again brought suit against Hartford, asserting an action for benefits under 29 U.S.C. § 1132(a)(1)(B), and state law claims for breach of an insurance contract and bad faith. On October 29, 2008, the district court determined that ERISA preempted Graham's breach of contract and bad faith claims, as well as her request for punitive damages. The district court also determined that Graham had no Seventh Amendment right to a jury trial on her § 1132(a)(1)(B) claim for

---

[3] The photocopy contained in the record does not indicate who signed the letter.

14

benefits. On March 13, 2009, the district court ruled that Hartford's denial of benefits was not arbitrary and capricious.

## II

Graham first challenges the district court's determination that the NRLCA disability benefits plan did not qualify for ERISA's "governmental plan" exemption. This is a legal conclusion we review de novo. Gualandi v. Adams, 385 F.3d 236, 242 (2d Cir. 2004).

Title I of ERISA, which "governs the Protection of Employee Benefit Rights" at issue in this dispute, Esden v. Bank of Boston, 229 F.3d 154, 173 n.23 (2d Cir. 2000) (quotations omitted), applies to "any employee benefit plan if it is established or maintained . . . by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce," 29 U.S.C. § 1003(a)(2). However, an employee benefit plan is exempt from the provisions of Title I if it qualifies as a "governmental plan." Id. § 1003(b)(1). The parties do not dispute that unless the NRLCA benefits plan qualifies as a governmental plan, ERISA governs its administration.

Title I of ERISA defines a "governmental plan" as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). ERISA's definition of a "governmental plan" "focuses on the public entity . . . that

15

'established or maintained' the plan. ERISA deems these *publicly-spawned* plans to be exempt." McGraw v. Prudential Ins. Co. of Am., 137 F.3d 1253, 1257 (10th Cir. 1998) (emphasis added). The definition of a "governmental plan" also creates a disjunctive standard: "a plan need only be established *or* maintained by a governmental entity in order to constitute a governmental plan." Gualandi, 385 F.3d at 242 (emphasis in original). In light of this emphasis, the issue becomes whether the USPS "established or maintained" the NRLCA disability benefits plan for its employees.

It is apparent that the USPS did not "establish" the NRLCA disability benefits plan. The plan was also not the product of collective bargaining; instead, the NRLCA contracted separately with Hartford to provide disability benefits. Cf. Lovelace v. Prudential Ins. Co. of Am., 775 F. Supp. 228, 229 (S.D. Ohio 1991) ("A plan established by a government employer through collective bargaining meets the ERISA 'governmental plan' requirements"). The USPS did not contribute payments toward the disability insurance premiums; rather, its rural letter carriers authorized deductions from their paychecks to pay for them. Cf. Gualandi, 385 F.3d at 244 ("[E]xclusive governmental funding is enough to constitute governmental establishment of a plan."); Fromm v. Principal Health Care of Iowa, Inc., 244 F.3d 652, 653 (8th Cir. 2001) (per curiam) ("Because the City paid the insurance premiums under the health care plan selected by the employees, the plan is deemed to be established and maintained by the City.").

16

Conceding that the USPS did not "establish" the plan, Graham instead argues that the USPS "maintains" the plan because it plays an "integral part of the [p]lan's operation." Aplt.'s Reply at 12.

Upon review of the plan documentation, we find no support for the view that the USPS "maintains" the plan. While the certificate of insurance designated the NRLCA as the policyholder and Hartford as the insurer, it only named the USPS as the employer. The explanatory brochure accompanying the NRLCA invitation letter indicated that the plan was "[a]rranged and [a]dministered by" the NRLCA's Group Insurance Department. R. at 118. In fact, the USPS's only involvement with the administration of the disability benefits plan is to make payroll deductions and to release to Hartford any information necessary for enrollment in and administration of the plan. This involvement is minor, almost clerical, and it is insufficient to support the conclusion that the USPS "maintains" the plan.

Graham fails to cite any authority that supports her assertion that the forwarding of payroll deductions and the release of employee information constitutes "maintaining" a plan under § 1002(32). She relies on several Department of Labor Advisory Opinions for the idea that a governmental plan "also includes a plan administered by an 'employee organization' . . . that provides benefits exclusively to employees of a [governmental entity] who are also the only members of the employee organization, provided that the plan is

17

funded exclusively by the government and by the government's employees who are members of the sponsoring employee organization."  Dep't of Labor ERISA Op. Letter No. 99-15A (Nov. 19, 1999), 1999 WL 1252003 at *2.  We note that "[a]gency opinion letters 'do not warrant <u>Chevron</u>-style deference;'" instead, agency opinion letters warrant "'respect . . . only to the extent that those interpretations have the power to persuade.'" <u>Clements v. Serco, Inc.</u>, 530 F.3d 1224, 1229 (10th Cir. 2008) (quoting <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000)).  We do not find these advisory opinions persuasive because they each rest upon a factual predicate which differs from the facts of the case at hand: each of the advisory opinions that Graham references concern benefit plans established pursuant to a collective bargaining agreement where the governmental employer at least partially contributes to the plans on behalf of its employees.[4]

---

[4] <u>See</u> Dep't of Labor ERISA Op. Letter No. 2000-06A (May 17, 2000), 2000 WL 744360 at *3 (concluding that three plans established for patrol officers qualified as governmental plans because each plan was established pursuant to a collective bargaining agreement with the city, the city provided all of the contributions to the plan except for the contributions covering the plans' private sector participants, and the city exercised oversight control over the plans); Dep't of Labor ERISA Op. Letter No. 2000-04A (Mar. 30, 2000), 2000 WL 1154961 at *2 (concluding that a plan qualified as a governmental plan because it was maintained pursuant to a collective bargaining agreement and was "substantially funded by contributions from the City with the remaining contributions being made by the Plan's participants"); Dep't of Labor ERISA Op. Letter No. 99-15A (Nov. 19, 1999), 1999 WL 1252003 at *2 (noting that a school district fund was a governmental plan because it was established pursuant to collective bargaining that required the school district to contribute to the fund on behalf of each employee, even though the fund covered one non-governmental employee); Dep't of Labor ERISA Op. Letter No. 95-25A (Oct. 3, 1995),  1995 WL 582729, at *2-3

(continued...)

18

Accordingly, we reject Graham's argument that the NRLCA disability benefits plan qualifies as a "governmental plan."

III

Graham next argues that district court improperly determined that she was not entitled to a jury trial on her claim for disability benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). This is a question of law that we review de novo. Adams v. Cyprus Amax Minerals Co., 149 F.3d 1156, 1158 (10th Cir. 1998).

This court, along with several of our sister circuits, has concluded that the Seventh Amendment guarantees no right to a jury trial in a § 1132(a)(1)(B) action for benefits.[5] In our decision in Adams, the plaintiffs brought an action for

_____

[4](...continued)
(concluding that benefit arrangements maintained by a police officer's relief association were governmental plans; even though the association did not have a collective bargaining agreement with the police department, the police department was required, pursuant to collective bargaining agreements with other employee organizations, to contribute the majority of funding to the benefit arrangements).

[5] See, e.g., Reese v. CNH Am. LLC, 574 F.3d 315, 327 (6th Cir. 2009) (reaffirming its prior holding that "the Seventh Amendment does not guarantee a jury trial in ERISA and LMRA cases because the relief is equitable rather than legal"); McDougall v. Pioneer Ranch Ltd. P'ship, 494 F.3d 571, 576 (7th Cir. 2007) ("The general rule in ERISA cases is that there is no right to a jury trial because ERISA's antecedents are equitable, not legal.") (quotations and citations omitted); Thomas v. Or. Fruit Prods. Co., 228 F.3d 991, 997 (9th Cir. 2000) ("[W]e hold that the remedies available to a participant or beneficiary under ERISA are equitable in nature and the Seventh Amendment does not require that a jury trial be afforded for claims made by participants or beneficiaries."); Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 568 (2d Cir. 1998) ("[C]ases involving ERISA benefits are inherently equitable in nature, not contractual, and [] no right to jury trial attaches to such claims.") (quotations and citations

(continued...)

19

benefits under § 1132(a)(1)(B) contending that they satisfied the definition of "corporate employees" contained in an enhanced severance plan.  In determining that there was no right to a jury trial for such a claim, we outlined the legal standard governing the right to a jury trial under the Seventh Amendment as follows:

> The Seventh Amendment preserves the right of trial by jury in Suits at common law, where the value in controversy shall exceed twenty dollars. . . . [T]he Seventh Amendment applies to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty.  To determine whether a particular statutory action more closely resembles an 18th century case tried in a court of law or one tried in a court of equity, we must examine both the nature of the statutory action and the remedy sought.  The more important factor is whether the remedy sought is legal or equitable in nature.

Id. at 1159 (citations, internal quotations, and alterations omitted).  Applying this standard, we concluded that the plaintiffs' § 1132(a)(1)(B) action was equitable in nature because the "threshold determination of whether Plaintiffs [were] eligible

---

[5](...continued)
omitted); Blake v. Unionmutual Stock Life Ins. Co. of Am., 906 F.2d 1525, 1526 (11th Cir. 1990) (per curiam) ("[T]his Circuit has held that plaintiffs are not entitled to a jury trial under ERISA when the issue is whether it was arbitrary or capricious for benefits to be denied."); Turner v. CF & I Steel Corp., 770 F.2d 43, 47 (3d Cir. 1985) ("[N]o jury trial is required in suits under § 502(a)(1)(B) by a beneficiary or participant against a trustee."); In re Vorphal, 695 F.2d 318, 320-22 (8th Cir. 1982) ("[W]e conclude that a jury trial is not required under section 502.").

20

to receive assets held in trust by the Defendants . . . must be guided by principles of trust law." Id. at 1161. The remedy sought, which was the recovery of benefits, was also equitable because it was "better characterized as equitable/restitutionary versus legal/compensatory relief." Id. at 1162.

Notwithstanding our precedent, Graham argues that we should revisit this issue in light of the Supreme Court's decision in Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204 (2002). Knudson analyzed the nature of a cause of action under § 1132(a)(3); it did not address the nature of a beneficiary's cause of action under § 1132(a)(1)(B), and therefore did not directly impact our prior ruling in Adams. See Reese, 574 F.3d at 327 ("Knudson, first and foremost, is not a Seventh Amendment case."). Nonetheless, Graham points to a specific concluding remark in Knudson in which the Court, comparing the statutory language of subsection § 1132(a)(3) with § 1132(a)(1)(B), noted that (a)(1)(B)'s language is "without reference to whether the relief sought is legal or equitable." Id. at 221. Building upon this statement, Graham argues that "most actions by beneficiaries are really for money obligations under the terms of a contract," and thus are "legal in nature, rather than equitable." Aplt.'s Br. at 39.

We reject this argument because it ignores the equitable underpinnings of a § 1132(a)(1)(B) action for benefits. "ERISA abounds with the language and terminology of trust law." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110 (1989). For example, the statute generally requires that "all assets of an

21

employee benefit plan shall be held in trust by one or more trustees," 29 U.S.C. § 1103(a), and that each benefit plan is "established and maintained pursuant to a written instrument" that names a fiduciary with the "authority to control and manage the operation and administration of the plan," 29 U.S.C. § 1102(a)(1). Additionally, ERISA's "fiduciary responsibility provisions codify and make applicable to ERISA fiduciaries certain principles developed in the evolution of the law of trusts." Firestone, 489 U.S. at 110 (quotations, citations, and alterations omitted). Because "Congress borrowed from the common law of trusts in enacting ERISA," Varity Corp. v. Howe, 516 U.S. 489, 528 (1996), trust law often provides a useful starting point interpreting its statutory provisions. See Beck v. PACE Int'l Union, 551 U.S. 96, 101 (2007) (noting that whether an employer is functioning as a plan sponsor or plan administrator "is an inquiry that is aided by the common law of trusts which serves as ERISA's backdrop"); Varity Corp., 516 U.S. at 497 ("[W]e believe that the law of trusts will often inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties."); Firestone, 489 U.S. at 111 ("In determining the appropriate standard of review for actions under § 1132(a)(1)(B), we are guided by principles of trust law.").

As we recognized in Adams, it is not surprising, given ERISA's trust law antecedents, that "courts consistently have characterized ERISA actions, including § 1132(a)(1)(B) actions, akin to common law trust actions and thus

22

governed by common law trust principles." 149 F.3d at 1160. Framed in this light, we have decided that the proper common law analogue for a § 1132(a)(1)(B) claim for benefits is "an action to enforce a trust," id. at 1162, which at common law was an equitable action given that "the courts of equity had exclusive jurisdiction over virtually all actions by beneficiaries for breach of trust." Mertens v. Hewitt Assocs., 508 U.S. 248, 255 (1993). The remedy for such an action was also equitable; as the Restatement (Second) of Trusts §§ 197-98 (1959) confirms, except in limited circumstances where the trustee has a duty to pay money or to transfer property "immediately and unconditionally" to a beneficiary, the "remedies of a beneficiary against the trustee are exclusively equitable." Accordingly, given the equitable nature of Graham's claim for benefits, Graham has no right to a jury trial on her § 1132(a)(1)(B) action for benefits. That Graham seeks money damages does not alter this conclusion because while it is true that money damages are "the classic form of *legal* relief," "[i]t is also true that money damages were available in those courts [of equity] against the trustee." Mertens, 508 U.S. at 255-56 (emphasis in original).

## IV

The district court concluded that Hartford's ultimate denial of disability benefits was predicated on a reasoned basis and supported by substantial evidence because Dr. Silver's independent examination of Graham's medical records was reliable, and Dr. Emel's conclusions did not necessarily contradict Dr. Silver's

conclusion. On appeal, Graham argues that her medical records which were generated during the Elimination Period should compel us to conclude Dr. Silver's report is unreliable. Having considered the entire administrative record, we disagree with this argument and affirm the district court's essential rationale. We conclude Dr. Silver's report is reliable, and that Dr. Emel's conclusions do not definitively, or consistently, reveal that Graham's physical injuries prevented her from performing the essential duties of her Modified Rural Carrier position during the Elimination Period. On the record presented, Hartford had a reasoned basis for ultimately denying Graham disability benefits.

## A

"The district court's determination of whether an ERISA benefits decision is arbitrary and capricious is a legal conclusion subject to *de novo* review." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002). In reviewing a challenge to a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), we apply an "arbitrary and capricious" standard of review to a plan administrator's decision when "the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms." Rekstad v. U.S. Bancorp., 451 F.3d 1114, 1119 (10th Cir. 2006). We apply the arbitrary and capricious standard to Hartford's ultimate denial of disability benefits because the plan conferred upon Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the

24

Group Insurance Policy," A.R. at 113.

Under the arbitrary and capricious standard of review, we will uphold an administrator's decision "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006). We will uphold an administrator's decision "unless it is not grounded on *any* reasonable basis." Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (citations and quotations omitted; emphasis in original). Certain indicia of an arbitrary and capricious denial of benefits include "lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary." Caldwell, 287 F.3d at 1282. Graham points to both a lack of substantial evidence and the fiduciary's conflict of interest as reasons for us to overturn Hartford's denial of benefits.

We define substantial evidence as "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance." Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992) (quotations, citations, and alterations omitted). "In determining whether the evidence in support of the administrator's decision is substantial, we must take into account whatever in the record fairly detracts from its weight." Caldwell, 287 F.3d at 1282 (quotations, citations, and alterations omitted).

25

Hartford's dual role as "both insurer and administrator of the plan" creates "an inherent conflict of interest between its discretion in paying claims and its need to stay financially sound." Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1296 n.4 (10th Cir. 2000). In such situations, the Supreme Court has instructed that we weigh the conflict of interest "as a factor in determining whether the plan administrator has abused its discretion in denying benefits . . . ." Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346 (2008). We have interpreted Glenn to embrace "a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'" Holcomb v. Unum Life Ins. Co of Am., 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting Glenn, 128 S. Ct. at 2351). The importance we attach to the existence of a conflict of interest is proportionate to the likelihood that the conflict affected the benefits decision. See id.

B

As noted earlier, Graham's entitlement to disability benefits under the NRLCA plan depended upon whether her ankle and knee injuries prevented her from performing the duties of her sedentary position during and beyond the Elimination Period (from July 16, 2000 until October 14, 2000). To answer this question, Hartford retained Dr. Silver, a board certified orthopedic surgeon, to independently review Graham's medical records to determine her functional limitations during that time. Dr. Silver reviewed those records, consulted Dr.

26

Emel, and reached the independent conclusion that Graham was capable of performing sedentary work during the Elimination Period because she could "sit for unlimited periods of time" and could "perform some form of ambulation around her office for approximately 15 to 20 minutes." A.R. at 174.

Requesting clarification, Hartford asked Dr. Silver if his conclusions and Dr. Emel's conclusions specifically addressed the Elimination Period. Although Dr. Silver was unsure that Dr. Emel "remembered 8 years earlier" because Dr. Emel "did not go back thru the medical records," when Dr. Silver contacted Dr. Emel again, Dr. Emel stated that although Graham was "50lbs heavier at the time," he "felt the restrictions would probably be the same but did not elaborate." Id. at 162. Hartford also asked Dr. Silver to elaborate upon Graham's ambulatory abilities during the Elimination Period. Dr. Silver responded that "Dr. Emel feels the claimant can sit for 8 hours a day and stand/walk 15-30 minutes 3 to 4 times daily but not on a frequent basis. I concur with Dr. Emel on this." Id. at 163. Based on Dr. Silver's independent review of Graham's medical records, his conversations with Dr. Emel, and the documents contained in Graham's claim file, Hartford ultimately concluded that Graham was capable of performing her sedentary job during the Elimination Period, and thus was not entitled to receive disability benefits.

Graham has framed her appeal on this issue as resting upon a "direct conflict" between her medical records which were generated before, during, and

27

after the Elimination Period and Dr. Silver's independent review and subsequent conversations with Dr. Emel eight years later. Aplt.'s Br. at 56. As such, Graham argues that the "reliable, contemporaneous evidence before, during and after" the Elimination Period should compel us to reject Dr. Silver's report as unreliable, and reject Hartford's ultimate denial of benefits as arbitrary and capricious. Id. We disagree. Graham's medical records do not undermine the reliability of Dr. Silver's evaluation, or the reasoned basis for Hartford's denial of benefits. To the contrary, the evidence before, during, and after the Elimination Period does not definitively establish that Graham's physical injuries prevented her from performing the essential duties of her Modified Rural Carrier Position from July 16, 2000 until October 14, 2000.

First, the medical documentation before and during the Elimination Period does not definitively reveal that Graham was totally disabled. No medical records exist for the period between March 21, 2000 (the follow-up evaluation to the cyst removal surgery) and July 17, 2000 (the first day of Graham's leave of absence). This gap in Graham's medical records, especially on the heels of an operation that successfully lessened Graham's ankle pain, makes it difficult to verify that Graham's physical impairments had deteriorated to the point that she had to retire. The medical records during the Elimination Period itself do not definitively reveal that Graham was totally disabled; in fact, the records at the beginning of that time frame suggest some improvement in Graham's condition.

28

Despite the swelling that Graham was experiencing in her ankle and the irritation she was experiencing in her knee during late July 2000, A.R. at 259, 263, Dr. Emel noted on August 10, 2000 that Graham's ankle and knee had both "improved," id. at 264-65. And we agree with the district court that Dr. Emel's July 26, 2000 recommendation for disability retirement, in which he states that he "really do[es] not think [Graham] will be able to continue her work capacities," is not dispositive. Id. at 262. That statement suggests a potential future incapacitation; it does not indicate that Graham was at that time incapable of performing a sedentary occupation.

Second, Dr. Emel's conclusions immediately following the Elimination Period do not necessarily identify Graham as incapable of performing her Modified Rural Carrier duties. In November and December 2000, Dr. Emel concluded on three separate occasions that Graham was unable to work: on November 10 Graham was "still not ready to return to work yet," id. at 270; on December 5 Graham was "still not in a position where she can work," id. at 272; and on December 12 Graham was "still temporarily totally disabled." Id. at 273. Despite the apparent firmness of these conclusions, they are not specific enough to demonstrate that the onset of Graham's incapacity coincided with the beginning of the Elimination Period. Additionally, it appears that Dr. Emel, while generally aware of Graham's "work limitations of mostly sedentary work," id. at 242, was not fully aware of the precise requirements of Graham's Modified

29

Rural Carrier position.  For example, in his July 26, 2000 letter, Dr. Emel acknowledged that Graham had "been on special duty for the last several years," but he indicated that "[a]n ambulatory job would be counterproductive for her." Id. at 262.  Given that Graham's Modified Rural Carrier position was sedentary, and not ambulatory, this misunderstanding casts doubt on Dr. Emel's conclusions during this period.

Third, Dr. Emel's later conclusions are either inconsistent with Graham being totally disabled during the Elimination Period, or are not specific enough to support such a conclusion.  The prime example of Dr. Emel's inconsistency is his January 23, 2001 conclusion that Graham's physical conditions did not affect her ability to perform sedentary work, a conclusion that stands in stark contrast to Dr. Emel's previous conclusions, as well the two Physical Capacities Evaluation Forms that he had just completed, both of which indicated that Graham could not endure an eight-hour-a-day sedentary desk job.  As the district court noted, although Hartford could not unilaterally rely on this statement to deny benefits, it does support the view that Dr. Emel did not have a strong opinion concerning Graham's sedentary work capabilities at that time.

Graham argues that we should disregard Dr. Emel's January 23, 2001 statement because Dr. Emel's later conclusions show how he "recanted, in unequivocal language, this single [January 23, 2001] medical record" which did not support Graham's disability.  Aplt.'s Br. at 44-45.  We do not find this later

30

disavowal in the administrative record. In fact, Dr. Emel's March 7, 2001 statement that Graham "really should not sit for more than an hour at any one time," is not necessarily inconsistent with being able to perform a sedentary job. A.R. at 448. And Dr. Emel's later correspondence contains only general statements which are bereft of any concrete detail that could establish Graham as totally disabled during the Elimination Period. The August 1, 2002 letter, presumably authored by Dr. Emel, concluded that Graham "is really not capable of doing even sedentary work for long periods of time," and insisted that "[t]here is no gainful employment for her to do at the post office." Id. at 275. That letter does not reference the Elimination Period, nor does it detail any evidence demonstrating entitlement under the plan. Dr. Emel's January 28, 2004 letter, in which he stated that Graham "has been unemployable in the last 2-3 years at least," suffers from the same lack of specificity. Id. at 277.

Finally, Graham also points to her disability retirement as evidence that she could not perform her sedentary position during the Elimination Period. Although Hartford's denial letter does not explain how it weighed this piece of evidence, we agree with the district court that it was nonetheless reasonable for Hartford to decide that it was not determinative. The administrative record contains only two documents that pertain to Graham's disability retirement: a letter from the OPM explaining that her application was approved, id. at 557-58, and the front side of a Civil Service Retirement System form entitled "Agency Certification of

31

Reassignment and Accommodation Efforts." Id. at 355.[6] On that form, the agency checked a box indicating that "the medical evidence presented to the agency shows that accommodation is not possible due to severity of medical condition and the physical requirements of the position." Id. The agency reviewer additionally noted on the form that "Ms. Graham has been given a limited duty job, but is unable to perform the duties of this job due to severity of her disabilities. She is currently on LWOP." Id. Apart from these notations, the form provides no insight into the procedures or methods the agency employed, the standards it applied, or the evidence it reviewed in determining that Graham was eligible for disability retirement. As such, it was reasonable for Hartford to conclude that it was not determinative.[7]

In sum, given the reliability of Dr. Silver's independent review, and the inconclusive nature of Graham's medical records, we conclude that Hartford had a reasoned basis for ultimately denying Graham disability benefits.

---

[6] Despite the form's indication that it was "[c]ontinued on reverse," the reverse side was not included in the administrative record. A.R. at 355.

[7] Graham also argues, for the first time in her reply brief, that we should consider the opinion of Dr. Jerry D. McKenzie, M.D., another examining physician, who after reviewing Graham's medical records and conducting a physical examination of Graham, opined in 2003 that Graham "has been temporarily, totally disabled since 7-15-00." A.R. at 369. Because "issues raised by an appellant for the first time in a reply brief are generally deemed waived," Wheeler v. Comm'r, 521 F.3d 1289, 1291 (10th Cir. 2008), we will not consider this argument.

32

V

For the reasons stated, we AFFIRM the judgment of the district court.