FILED
United States Court of Appeals
Tenth Circuit

December 3, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

CHRISTY M. LIEBEL,

Plaintiff - Appellant,

v.

AETNA LIFE INSURANCE
COMPANY,

Defendant - Appellee.

No. 14-6046
(D.C. No. 5:12-CV-01315-C)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Christy M. Liebel brought this action under the Employee Retirement Income

Security Act (ERISA) after being denied long term disability benefits by Aetna Life

Insurance Company (Aetna), which administers a disability plan on behalf of her

former employer. The district court entered judgment for Aetna, and Ms. Liebel

appealed. We affirm for the reasons explained below.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I. GENERAL BACKGROUND

Ms. Liebel has a history of painful back (and related) problems, associated with scoliosis and exacerbated by injuries, which have been addressed through a series of surgeries ultimately leading to a fusion from the sacrum through the thoracic spine. Aetna awarded her disability benefits for a twenty-four month period from September 2009, under a plan provision tying the determination of disability solely to the job she had performed. Aetna also encouraged her to apply for Social Security disability benefits (which would be offset against Aetna's obligations under the plan) and provided the services of a specialized Social Security claims administration company to represent her. In August 2010, the Social Security Administration (SSA) determined that she was disabled, with an onset date of March 2009. Under social security statutes and regulations, that determination required the SSA to find her unable to perform not just her past job but all other occupations available in the national economy. *See Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).

Under the Aetna plan, an all-occupation disability standard like that used for social security applies for continuing long term disability (LTD) benefits after the first twenty-four months,[1] and Aetna initiated a review of Ms. Liebel's condition in light of this stricter standard in 2011. Aetna requested her medical records, retained

---

[1] Actually, the plan refers to the ability to perform "any ***reasonable occupation***," App. at 849 (emphasis added), defined as "gainful activity . . . [f]or which [the claimant is], or may reasonabl[y] become, fitted by education, training, or experience" and "[w]hich results in, or can be expected to result in, an income of more than 60% of [the claimant's] **adjusted predisability earnings**," *id.* at 868.

physicians to review them and engage in peer-to-peer consultation with her medical providers, sent her for an independent medical examination and a functional capacity evaluation, and had a home assessment conducted by a registered nurse. Aetna ultimately concluded that, with a gradual work-hardening program recommended by her doctor, Ms. Liebel could perform sedentary work that met the criteria for gainful activity in a reasonable occupation. Aetna accordingly provided her with a lump sum of three months' additional benefits to cover the program and terminated her LTD status. The district court upheld Aetna's decision and this appeal followed.

Ms. Liebel contends Aetna improperly ignored the contrary SSA determination of disability and conducted a skewed and incomplete assessment of her claim. She also contends the district court reviewed Aetna's decision under an unduly deferential standard. Because we independently review Aetna's decision, *see Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009), any question about the deference it warrants is a threshold consideration for us, and we address it before her other objections. But first we set out a more detailed summary of the evidence. When the substance and timing of the evidence is fully appreciated, the force of Ms. Liebel's objections to Aetna's decision dissipates.

## II. SUMMARY OF MEDICAL EVIDENCE

### A. Evidence Leading to Initial Aetna and SSA Disability Awards

After her last back surgery in March 2009, Ms. Liebel saw Dr. Richard Hostin for follow-up care and Physician Assistant (PA) Eric Buchl for pain management.

Neither had cleared her for a return to work by September 2009, when Aetna granted her benefits under its initial past-occupation LTD standard. Her surgeon, Dr. Alexis Shelokov, had also agreed she could not work as of July 2009, but indicated a return to work was a matter yet to be determined and there was no "contraindication for [her] to participate in Vocational Rehabilitation (job training) programs." App. at 238. In October 2009, PA Buchl found her "improving in terms of her work status" and looked to "reassess her return to work status in three months' period of time," *id.* at 268. Dr. Hostin, however, was already convinced in August 2009 that she would not return to work and should go on long term disability. *Id.* at 248, 249, 251. On a physical capabilities and limitations form, he marked "never" or "no" for every activity listed. *Id.* at 251.

Upon a reassessment in December 2009, PA Buchl again declined to clear Ms. Liebel for work and indicated that "long-term disability would be appropriate for her." *Id.* at 264. Shortly thereafter, Dr. Hostin summarily reiterated his opinion that she could not return to work. *Id.* at 259. In early 2010, Ms. Liebel discontinued her pain management with PA Buchl, substituting Dr. Steven Remer, *see id.* at 334 (Dr. Remer's new-patient report dated May 10, 2010, "regarding the primary complaint of back pain"). Dr. Remer's office records from this time reflect active

treatment for back pain, but no specific opinions on ability/return to work.[2]  That is essentially where matters stood when the SSA awarded Ms. Liebel disability benefits in August 2010.

**B.  Evidence Developed for Aetna's Initial LTD Denial on 2/9/12**

Aetna initiated a thorough review of Ms. Liebel's condition in anticipation of the change from the past-occupation to the any-reasonable-occupation disability standard that would occur in September 2011.  The primary evidence developed in connection with that review is summarized in the subsections below.

**1.  Dr. Johnson (2011):**  In March 2011, Dr. Hostin (who no longer participates in disability evaluations) sent Ms. Liebel for a disability consultation with Dr. Christine Johnson.  Noting scoliosis with multiple back surgeries, advanced cervical disc degeneration, and chronic pain syndrome, Dr. Johnson stated she did "not believe [Ms. Liebel] is going to be able to return to full-time employment." App. at 396.  She did not specify any particularized functional limitations underlying that opinion.  In April 2011, she filled out an "Attending Physician Statement" (APS) noting that Ms. Liebel is capable of working "0" hours per day and that this incapacity is "permanent."  *Id.* at 400.  But the only specific limitations she referred to were lifting no more than ten pounds, changing positions as needed, and no prolonged bending or stooping.  *Id.*

---

[2]     Under social history, his new-patient report noted her "Emp[loyment] Status" as "Disabled," App. 334, but there is nothing to suggest this was anything other than a notation of her reported employment situation.

On May 27, 2011, Aetna sent Dr. Hostin a letter indicating it needed an updated "Capabilities and Limitations" (C&L) form, *id.* at 406, which asks for specific ratings on a host of physical, sensory, and environmental categories. He apparently forwarded the faxed C&L form to Dr. Johnson, who noted on the fax cover sheet that she had not seen Ms. Liebel since the March consult and had already sent Aetna her completed paperwork, i.e., her April APS. *Id.* at 407. Aetna sent another letter to Dr. Hostin, recounting these events and again requesting a completed C&L form, along with a new APS and a copy of Dr. Johnson's March consult. *Id.* at 430. On June 22, 2011, Ms. Liebel saw Dr. Johnson for a follow-up examination. Dr. Johnson prepared a short report, *see id.* at 436-37, and completed the APS, *see id.* at 431, but there is no indication in the record that she filled out the C&L form. And while this particular APS form asked for capacity ratings on a number of important physical functions, Dr. Johnson did not complete that section.[3] *See id.* at 431. She stated only the bare conclusion that Ms. Liebel had no expected return-to-work date. *Id.* Nor did her report address any functional limitations on Ms. Liebel's ability to work.

---

[3]     Ms. Liebel saw Dr. Remer the same day (she had moved to Oklahoma from Texas in 2010, and Dr. Johnson and Dr. Remer practiced in the same Texas city). He filled out an APS form on which he indicated "ongoing" disability with half-hour limits on sitting, standing, and walking; no lifting, pushing/pulling, or bending/stooping; and one-hour limits on keying/computer, hand grasping, repetitive motion, and reaching. *Id.* at 432. There is no associated report setting out clinical bases for these ratings from Dr. Remer (the last office visit reflected in the record was on January 28, 2011, and, as noted earlier, his notes do not address ability/return to work).

On July 13, 2011, an Aetna representative sent Dr. Johnson a letter to "ask for [her] assistance in determining [Ms.] Liebel's current level of function to be sure that I am considering all of the medical data in making an assessment of her functional capacity." *Id.* at 434. The letter indicated that, based on the existing record, the representative was inclined to find a full time sedentary work capacity, with the lifting, change-of-position, and bending/stooping limitations note in Dr. Johnson's April APS. *Id.* at 435. Dr. Johnson responded with a summary handwritten notation on the letter stating "do not agree" and referring to her June 22 report. *Id.* That is the last document in the record from Dr. Johnson until a letter sent in January 2012, relating to further developments that need to be recounted to put it in context.

**2. Dr. Swotinsky:** Aetna assigned Dr. Robert Swotinsky to conduct a medical file review in August 2011. *See id.* at 441. He considered imaging tests from late 2010, physical examination findings from Dr. Hostin, pain management records from 2010-11, and Dr. Johnson's March and June examinations. *Id.* at 442-43. He also cited a peer-to-peer consultation with Dr. Johnson on August 8, 2011, in which Dr. Johnson said that Ms. Liebel's limitations are "per the patient" because Dr. Johnson "can only go on what the patient says." *Id.* at 443; *see also id.* at 444 (noting "Dr. Johnson has not independently identified functional limitations or cause for the claimant's self-reported inability to work"). Noting that the clinical findings did "not explain the reason for [Ms. Liebel's] self-reported back pain and limitations," and that "her activity level appears inconsistent with complete

disability,"[4] Dr. Swotinsky concluded that she "can at least perform work of sedentary physical demand." *Id.* at 444.

3. **Functional Capacity Evaluation (FCE):** In September 2011, Aetna sent Ms. Liebel for an FCE conducted by Physical Therapist Amy Ridgeway. The resultant report found limited range of motion in all directions but the ability to lift ten pounds, reach occasionally (up to two hours), sit, squat, kneel, stoop, and climb stairs occasionally, stand and walk frequently (up to five hours each), and balance and grasp constantly (longer than five hours). *Id.* at 457-58, 460. It also noted that Ms. Liebel's true maximal capabilities could not be determined "due to refusal to attempt activities, inconsistent effort, and self-limiting behavior." *Id.* at 458. In this vein, while Ms. Liebel complained of pain during the evaluation, "[p]hysiological responses (heart rate and respiratory rate) did not correlate with [her] subjective complaints of severe pain."[5]

4. **Home Assessment:** In October 2011, Aetna had Donna Wheeler, RN, conduct a home assessment. Ms. Liebel lives alone. She told Ms. Wheeler that she cleans the inside of her home, but the neighborhood does outside maintenance. *Id.* at

---

[4] As Ms. Liebel notes, however, Dr. Swotinsky had a somewhat exaggerated view of her daily activities, in particular his understanding that she "helps care for her infirmed mother." App. at 444. The record reflects that her mother lives in a nursing home and that Ms. Liebel's "care" consists of visiting her. Subsequent review by Aetna doctors recognized this point. *See, e.g.*, *id.* at 750.

[5] The report also recounted a specific instance of a limitation displayed during the evaluation (inability to reach past knee level without upper extremity support) later belied when Ms. Liebel picked up her drink from the floor. App. at 458.

475. She said a typical day consists of making breakfast, doing a Bible study, sometimes visiting her mother in a nursing home, trying to walk her dog a few feet,[6] and spending most of the day in a recliner or bed. *Id.* at 474. Ms. Liebel identified her physicians, some of whom (for example, Dr. Remer, Dr. Hostin, and Dr. Johnson) were in Texas, requiring a trip 200 miles each way. *Id.* at 473-74. She has her own car, but for these trips she has a friend do the driving. *Id.* at 474. The assessment did not conclude with any functional capacity findings.

**5. Dr. Carl:** In November 2011, Aetna sent Ms. Liebel for an Independent Medical Examination (IME) by Dr. Michael Carl, a physician board certified in physical medicine and rehabilitation with a specialty in pain management. *See id.* at 477. In addition to conducting his own physical examination, Dr. Carl reviewed medical records from Dr. Hostin and Dr. Johnson, Dr. Swotinsky's report, the FCE and home assessment, and Ms. Liebel's summaries of her medical/surgical history and medications.[7] *Id.* He noted various diagnoses, including scoliosis, status post multiple spine surgeries, lower back pain (lumbago), cervical disorder, and chronic pain syndrome. *Id.* at 481. On the basis of the records reviewed and his own

---

[6]    In contrast, she had walked twenty-seven minutes for the FCE just a month before. *See* App. at 462.

[7]    Ms. Liebel objects that Dr. Carl did not consider records from her most recent pain management caregiver, Dr. Bruce Mackey, whom she began seeing in August 2011. But she did not provide Aetna with any of Dr. Mackey's records until much later. As explained shortly, upon receiving the records Aetna had another doctor conduct a review of the full augmented record, which reaffirmed Dr. Carl's opinion.

examination, Dr. Carl found Ms. Liebel capable of sedentary work, with occasional lifting up to ten pounds and no crawling, bending or twisting, limited to the home setting to avoid driving so long as she remains on narcotic pain medication. *Id.* at 482, 484. His detailed findings of functional capacity, recorded on a C&L form, essentially confirmed those previously found by the FCE. *See id.* at 483.

**6. Dr. Johnson (2012):** On January 4, 2012, following up on Dr. Carl's IME, Dr. VanderPutten conducted a peer-to-peer consultation with Dr. Johnson regarding a possible return to sedentary work for Ms. Liebel.[8] Dr. Johnson indicated that she believed work would be beneficial but that "work hardening" would be necessary to address fatigue issues. *Id.* at 490. She also said that Ms. Liebel should have the opportunity to change postural positions as necessary for comfort, move about some if necessary, and alternate sitting and standing as necessary. *Id.*

Aetna forwarded Dr. VanderPutten's record of the peer-to-peer consultation, along with the IME report from Dr. Carl, to Dr. Johnson for her comment. She confirmed that she recommended a trial return to work, but emphasized that "[a]t this time, I do not believe that Ms. Liebel is capable of working sedentary duty activities on a full-time basis (eight hours per day, five days a week)." *Id.* at 488. She stated that the return to work should be done gradually, starting with one to two hours per

---

[8]     Dr. VanderPutten also asked Dr. Johnson about a possible concern Dr. Carl had noted regarding the potential for Ms. Liebel's medication interfering with the cognitive demands of work. Dr. Johnson indicated she did "not believe that medications, per the concern of the IME, are an issue." App. at 490.

day, under supervision of a vocational counselor or occupational medicine provider, and repeated the need for postural changes. *Id.* She did "not believe [Ms. Liebel] will be successful in return to work, unless [these] recommendations are followed." *Id.* A month later (following Aetna's initial denial of LTD benefits discussed below), Dr. Johnson wrote a prescription for a work hardening program to run five days per week for six weeks, with an FCE to start the program.[9] *Id.* at 494.

## C. Initial LTD Denial; Additional Evidence; Final LTD Denial

Aetna informed Ms. Liebel of its denial of LTD benefits in a letter dated February 9, 2012. *See id.* at 592-93. Aetna's decision relied primarily on Dr. Carl's IME findings, but it was also informed by Dr. Johnson's recent recommendations for a gradual return to work. Aetna accordingly approved an additional three months of LTD benefits to enable Ms. Liebel to enter a work hardening program to assist in her gradual return to a sedentary work capacity. *Id.* at 593. The letter informed Ms. Liebel of her right to appeal and to submit additional information for review, *id.*, which she did.

**1. Dr. Mackey:** In May 2012, Ms. Liebel's counsel sent Aetna the medical records of Dr. Bruce Mackey (the pain management physician she began seeing in

---

[9] Ms. Liebel argues in passing that this reference to an FCE means that Dr. Johnson's approval of the work hardening program and ensuing return to work should be discounted unless and until an FCE is done. But Dr. Johnson never said her recommendation of the work hardening program was contingent on an FCE; rather, it appears the FCE was to be done to inform the ensuing program. In any event, as discussed earlier, Ms. Liebel had recently had an FCE done, finding her capable of a full time (let alone part-time) return to sedentary work.

August 2011 after terminating her care under Dr. Remer).  *See id.* at 766.[10]  His initial office consultation summary indicates Ms. Liebel's primary complaints were "[b]ack pain and pain all over."  *Id.* at 797.  The extant medical record generally reflected reported symptoms consistent with such complaints, though Dr. Mackey cataloged a longer list of specific associated conditions including, as Ms. Liebel emphasizes in her briefing, fibromyalgia.  *See id.* at 799, 804.  Medical records of Dr. Mackey through April 23, 2012, reflect ongoing complaints of and treatment for pain, but no findings regarding functional impairment or ability/return to work.  On March 14, 2012, Dr. Mackey stated that Ms. Liebel would need to find another physician for help with any disability claim.  *See id.* at 773.  He did not respond to subsequent efforts for peer-to-peer consultation or for comments on medical reviews by physicians on behalf of Aetna.

2.  **Dr. Rubin:**  After receiving Dr. Mackey's records, Aetna engaged two more physicians to conduct a review of the augmented administrative record.  The report of Dr. Klotz, a pulmonary specialist, is not germane to the matters at issue on this appeal, but the June 15, 2012 report of Dr. Stuart Rubin, a pain management specialist, clearly is relevant.  Dr. Rubin reviewed essentially the entire file, including the new records from Dr. Mackey, *see id.* at 507-08.  He also tried to contact Dr. Mackey's office for a peer-to-peer consultation, but his calls were not

---

[10]  Counsel also referred to a report from a Dr. Lance Rosson regarding work hardening, but he provides no record cite for it and we have found no such report in the administrative record.

- 12 -

returned. *See id.* at 509. Ultimately, Dr. Rubin concluded that the previously assigned sedentary work capacity, with accommodations for gradual return to work and the ability to change positions as needed, was appropriate. *See id.* at 510.

On July 3, 2012, Aetna affirmed the initial decision denying LTD benefits. *See id.* at 839-41. The rationale was essentially the same, though new evidence submitted in the interim was discussed.

### III. DEFERENCE OWED TO AETNA DECISION

When, as here, a benefit plan "confers upon the administrator discretionary authority to determine eligibility for benefits or to interpret plan terms, 'a *deferential standard* of review is appropriate.'" *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)). "In such cases, we review the administrator's decision for abuse of discretion," which we treat "as interchangeable in this context" with "the-arbitrary-and-capricious standard." *Id.* (internal quotation marks omitted). When unaffected by other considerations, this is a very deferential standard:

> When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded in *any* reasonable basis. The reviewing court need only assure itself that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end.

*Nance v. Sun Life Assur. Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002) (brackets and internal quotation marks omitted).

- 13 -

But there is a tempering consideration here. "Where the plan administrator is operating under a conflict of interest, that conflict may be weighed as a factor in determining whether the plan administrator's actions were arbitrary and capricious." *Foster*, 693 F.3d at 1232 (brackets, ellipses, and internal quotation marks omitted). "A plan administrator [such as Aetna] acting in a dual role, i.e., both evaluating and paying claims, has such a conflict of interest." *Id.* "In such cases, we apply a combination-of-factors method of review that allows judges to take account of several different, often case-specific factors, reaching a result by weighing all together." *Id.* (internal quotation marks omitted).

In this regard, a conflict "'should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Holcomb*, 578 F.3d at 1193 (quoting *Glenn*, 554 U.S. at 117). Of particular relevance here, we give a conflict "limited weight in evaluating whether [a plan administrator] abused its discretion" when it "did not rely solely on . . . its own on-site physicians and nurses" but "took steps to reduce its inherent bias by hiring . . . independent physicians" to assess the claimant's alleged disability. *Id.* The district court properly invoked this consideration in according diminished weight to Aetna's dual-role conflict here. We do so as well. [11]

---

[11] In particular, we note Aetna's use of the IME by Dr. Carl. The district court also cited Aetna's use of Dr. Swotinsky and Dr. VanderPutten to review Ms. Liebel's medical records and engage in peer-to-peer consultations, but we do not rely on their participation as part of our conflict analysis. In direct contrast with a reference to

(continued)

- 14 -

That is not the end of the matter, however. The Supreme Court held in *Glenn* that encouraging and assisting a claimant to apply for social security benefits, while denying benefits under a plan using a similar disability standard, would justify a "court in giving more weight to [a dual-role] conflict," because the "seemingly inconsistent positions" are "both financially advantageous" to the administrator (who gets to apply social security benefits as an offset against benefit obligations under the plan). 554 U.S. at 118. Thus, the deference needle, properly "dialed back" in light of Aetna's use of an IME, may be nudged forward again in response to Aetna's conduct in connection with Ms. Liebel's social security benefit application.[12] Because the SSA disability determination is also a stand-alone factor in Ms. Liebel's challenge to Aetna's contrary decision, we pursue this point further in the section below dealing specifically with that factor. Our analysis there leads us to conclude that Aetna's conduct in connection with the SSA award should have little effect on our deferential standard of review.

---

Dr. Carl as an "independent" examiner, Aetna called Dr. VanderPutten "our physician," App. at 486, and we note that "Dr. Robert Swotinsky" was pointedly characterized as an "Aetna employee[]" in a recent ERISA case, *McDonough v. Aetna Life Ins. Co.*, 2014 WL 690319, at *7, *13 n.12 (D. Mass. Feb. 19, 2014). While we do not reach any definitive conclusions regarding their status vis a vis Aetna, we hesitate to rely on their unsubstantiated independence here. But even as to physicians who may not qualify as independent, we note Aetna made an effort to provide Ms. Liebel's independent doctors their reports for review and comment.

[12] We clarified the nature of this "dialing" deference process in light of *Glenn* in *Murphy v. Deloitte & Touche Group Insurance Plan*, 619 F.3d 1151, 1157 n.1 (10th Cir. 2010).

## IV.  REVIEW OF AETNA'S DENIAL OF LTD BENEFITS

The evidence recounted in the summary above is sufficient to support Aetna's decision to deny disability benefits.  In reviewing a plan administrator's discretionary denial of benefits for adequate evidentiary support, we apply a substantial-evidence standard.  *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1357 (10th Cir. 2009).  Under this standard, we look for "such evidence that a reasonable mind might accept as adequate to support the conclusion," which "requires more than a scintilla but less than a preponderance."  *Id.* at 1358 (internal quotation marks omitted).  Dr. Carl's independent examination, the FCE, and the successive reviews of Dr. Swotinsky and Dr. Rubin, all support Aetna's determination, which is also largely consistent with later communications from Ms. Liebel's physician, Dr. Johnson.  It is, of course, contrary to some earlier opinions, but it certainly reflects a reasonable judgment supported by substantial evidence.

The remaining question, then, is whether Aetna's decision is arbitrary or capricious because of procedural irregularity.  As noted earlier, Ms. Liebel raises a number of objections in that regard.

### A.  Treatment of SSA Disability Determination

Like the plan administrator in *Glenn*, Aetna "ignored the [SSA's] finding [that Ms. Liebel could do no work] in concluding that [she] could in fact do sedentary work."  *Glenn*, 554 U.S. at 118.  *Glenn* noted this could "suggest[] [a] procedural unreasonableness" that would be "an important factor in its own right."  *Id.*  Aetna

responds to this concern by arguing that disability under the plan was not contingent upon or related to SSA disability, and cites an unpublished pre-*Glenn* decision stating that SSA determinations cannot be dispositively equated with their counterparts under ERISA. That broad-brush argument is not very helpful. While concededly not formally equivalent, the SSA all-occupation disability standard and the plan's any-reasonable-occupation disability standard overlap to such a degree that contrary determinations at least call for some reconciliation—as *Glenn* indicates.

Aetna and the district court are more on the mark in distinguishing SSA and ERISA here more specifically in light of the special rule of deference in SSA cases for treating-physician opinions, which does not apply under ERISA,[13] and in noting that the SSA determination, made nearly two years before Aetna's final decision,[14] covered an earlier period implicating medical evidence (including treating opinions) different from the evidence directly relevant to Aetna's decision. Prominent medical records underlying Aetna's final decision, including examinations carried out in the relevant period specifically for disability purposes by Dr. Carl and Dr. Johnson, did not exist when the SSA issued its decision. Nor did the multiple medical-record reviews, FCE, and home assessment report ordered in conjunction with Aetna's

---

[13] The Supreme Court established this significant distinction in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003).

[14] SSA issued its decision on August 21, 2010. Aetna's initial decision terminating benefits on February 9, 2012, was upheld by a final decision on July 3, 2012.

reassessment of LTD benefits in light of the any-reasonable-occupation standard. Earlier, when Aetna assisted Ms. Liebel in obtaining SSA benefits (and granted her twenty-four months' disability benefits itself under the past-occupation standard), no medical opinions indicating a sedentary work capacity then existed to contrast with Ms. Liebel's evidence from her earlier treating sources. Under the circumstances, the discrepancy between the SSA determination, deferring to old treating opinions, and Aetna's later decision, based on a greatly augmented medical record unskewed by special deference to evidence provided by Ms. Liebel's physicians, does not bespeak arbitrary and capricious conduct under the standard governing our review.

## B. Skewed and Incomplete Assessment of the Evidence

Ms. Liebel complains that Aetna relied on its own experts rather than on the more detailed and specific findings of her treating physicians. This complaint is meritless. First of all, as already noted, a claimant's own treating physicians are not entitled to particular weight in the ERISA context. Second, the IME and FCE obtained by Aetna—from independent sources—were, if anything, more detailed and specific as to the critical findings regarding functional capacity and limitation than were Ms. Liebel's treating sources who offered any opinions as to disability.

Ms. Liebel contends Aetna's physicians failed to consider her failed back syndrome, radiculopathy, fibromyalgia, and narcotic use. We reject this contention as well. Failed back syndrome refers to chronic back pain following surgery, which was obviously considered by every physician reviewing her claim of back pain.

- 18 -

Radiculopathy associated with Ms. Liebel's spine problems was noted sporadically throughout the medical records and nowhere was it found to be a condition rendering her unable to work. The physicians reviewing these records for functional impairment did not have to specifically refer to this reported symptom to demonstrate that they considered it insufficient to support Ms. Liebel's disability claim.

Fibromyalgia is a different matter. It would not be a symptom of Ms. Liebel's well-documented spine problems, naturally reported and considered in conjunction with the rest. Ms. Liebel complains that Aetna's physicians did not discuss this condition and that it was not mentioned in Aetna's decisions denying LTD benefits. But no fault may properly be attributed to Aetna in this regard. The condition was first diagnosed by Dr. Mackey (and Dr. Mackey only) in August 2011, but his records were not provided to Aetna until Ms. Liebel's appeal from the initial denial of LTD benefits was pending. Aetna promptly provided these records to pain-management specialist Dr. Rubin, who reviewed them along with the rest of the evidence in the case and reaffirmed the previously determined functional capacity underlying Aetna's initial decision. He did not specifically refer to the condition. But given the fact that none of Ms. Liebel's doctors—not Dr. Mackey himself and not one of the doctors who had opined that Ms. Liebel was disabled for other reasons—stated that fibromyalgia caused or contributed to an inability to work, the absence of a specific reference to this condition in Dr. Rubin's report or Aetna's final

decision does not demonstrate any impropriety warranting disturbance of the denial of LTD benefits here.

The effect of Ms. Liebel's narcotic use on her ability to work was expressly considered by Aetna's physicians. As recounted in the evidentiary summary above, after Dr. Carl raised the question, Dr. VanderPutten engaged in a peer-to-peer consultation with Dr. Johnson to confirm that Ms. Liebel's pain medication would not interfere with work.

In a related vein, Ms. Liebel complains that doctors used by Aetna were not provided with various items of evidence. But, again, that was largely a function of the sequence in which evidence was developed by and/or provided to Aetna. For example, it is hardly a cogent criticism that Dr. Mackey's records, which are noted prominently in this regard, were not considered in the course of medical reviews and examinations conducted long before Ms. Liebel provided Aetna with those records. As a general matter, the evidentiary summary shows Aetna proceeded in a reasonable fashion to develop the record relevant to its determination of disability for the period in question. As new evidence arose or was submitted, Aetna made an effort to supply that evidence to its own and to Ms. Liebel's doctors for review and comment.

Ms. Liebel complains in particular that a letter she drafted about her condition and related events was not considered. *See* App. at 514-21. But that letter does not contain material information not already sufficiently represented in the record.

In sum, Aetna gave Ms. Liebel a full and fair opportunity to present her claim, conducted a procedurally reasonable review of the material evidence, and reached a decision supported by substantial evidence.

The judgment of the district court upholding the administrator's decision is affirmed.

Entered for the Court


Stephen H. Anderson
Circuit Judge