The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 8, 2018

## 2018COA32

**No. 17CA0019 Meardon v. Freedom Life Insurance— Health Insurance — Remedies for Unreasonable Delay or Denial of Benefits — Federal Supremacy — Preemption — McCarran-Ferguson Act**

A division of the court of appeals considers, as a matter of first impression, whether a mandatory arbitration clause in a health care insurance policy is displaced by section 10-3-1116(3), C.R.S. 2017, which allows denied claims to be contested in court before a jury. The division holds that the policy's conformity clause invalidates the arbitration clause for those claims covered by section 10-3-1116(3). The division further holds that the Federal Arbitration Act (FAA) does not preempt section 10-3-1116(3) because the McCarran-Ferguson Act preempts the FAA under the doctrine of reverse-preemption. Accordingly, the division affirms the trial court's order as to those claims that fall within the ambit of

the statute, but reverses the court's order as to those claims that fall outside the scope of the statute. The division remands the case for the trial court to determine which claims fall within the statute and which clams do not.

The dissent would reverse the trial court's order denying Freedom Life's motion to compel arbitration and remand this case to the trial court to grant that motion and then to dismiss this case.

COLORADO COURT OF APPEALS      **2018COA32**

Court of Appeals No. 17CA0019
City and County of Denver District Court No. 16CV32553
Honorable Catherine A. Lemon, Judge

Kathryn D. Meardon,

Plaintiff-Appellee,

v.

Freedom Life Insurance Company of America and Robert J. Pavese,

Defendants-Appellants.

ORDER AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE FREYRE
Berger, J. concurs
Bernard, J., dissents

Announced March 8, 2018

Meier & Giovanini, LLC, Doug E. Meier, Lakewood, Colorado, for Plaintiff-Appellee

Lewis Roca Rothgerber Christie LLP, Hilary D. Wells, Frances Scioscia Staadt, Denver, Colorado, for Defendants-Appellants

¶ 1     The defendants, Freedom Life Insurance Company of America and Robert J. Pavese (collectively Freedom Life), denied health insurance benefits claimed by plaintiff Kathryn D. Meardon under a health insurance policy (policy) issued to her by Freedom Life.  We must decide a novel issue: whether that policy's mandatory arbitration clause is displaced by section 10-3-1116(3), C.R.S. 2017, which allows denied claims to be contested in court before a jury.  We conclude that it is.

¶ 2     The policy purchased by Ms. Meardon sets forth a three-step procedure for contesting a denied claim.  Step one is negotiation, step two is mediation, and step three is binding arbitration.  At issue here is the last step — final and binding arbitration; the policy expressly prohibits the filing of any state or federal court action.  Section 10-3-1116(3), by contrast, provides that an insured who is wholly or partially denied a claim for health benefits "shall be entitled" to de novo review in any court with jurisdiction and to a trial by a jury, after exhausting administrative remedies.  Thus, the question before us is whether Ms. Meardon is bound by the policy's arbitration clause or whether she may seek relief from a jury in a court.

1

¶ 3     To resolve this case, we first analyze the "conformity clause" that Freedom Life elected to include in its policy.  Then we address the difficult issues presented both by the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16 (2012), and the arcane doctrine of reverse-preemption under the McCarren-Ferguson Act, 15 U.S.C. §§ 1011-1015 (2012), which may or may not preempt section 10-3-1116(3) and render the arbitration clause operative.

¶ 4     Freedom Life appeals the trial court's order that denied their motion to dismiss or compel arbitration.  Because we conclude that the state statute displaces the arbitration clause for those claims that fall within the ambit of the statute, we affirm the trial court's order as to those claims.  However, because some of Ms. Meardon's claims fall outside the scope of the statute, we reverse the court's order to that extent and remand with directions.

## I.     Background

¶ 5     Ms. Meardon alleged that Mr. Pavese, acting as a Freedom Life insurance agent, sold her a policy that did not comply with the Affordable Care Act, even though she requested one.  She further alleged that the policy did not cover a pre-existing condition, which the Act also required.

¶ 6    Later that year, Ms. Meardon underwent surgery, and she submitted a claim to Freedom Life.  Freedom Life denied the claim because it decided that the surgery resulted from a pre-existing condition that was not covered by the plan.  Ms. Meardon tried to resolve the dispute by sending letters and documents showing that the surgery did not result from her pre-existing condition.  Freedom Life reaffirmed its decision to deny Ms. Meardon's claim, and she filed this lawsuit.

¶ 7    Freedom Life moved to compel arbitration and to dismiss the case.  It relied on the policy's mandatory arbitration clause, which states as follows:

(1)    The policyholder was required to resolve "[a]ny [d]ispute" through "mandatory and binding arbitration."  (The policy defines "[d]ispute" to include practically every claim "in any way arising out of or pertaining to, or in connection with th[e] policy.")

(2)    The policyholder does not have a right to seek resolution of her claim in a federal or state court.

(3)    If the policyholder tries to file a complaint in a federal or state court, the court should dismiss the complaint.

3

¶ 8     The policy also contains a "conformity clause," which states that "[a]ny provision of this [p]olicy which, on its effective date, is in conflict with the laws of the state in which [y]ou live on that date, is amended to conform to the minimum requirements of such laws."

¶ 9     The trial court denied Freedom Life's arbitration motion. Relying on the conformity clause, the court decided that (1) section 10-3-1116(3) gives a policy holder a right to a judicial resolution of her claim; and (2) this statutory right voids the policy's arbitration clause. Expanding on the second point, the court wrote that subsection 1116(3) "effectively forbids mandatory arbitration clauses in [health insurance] policies, and confers specifically upon . . . policy holders the statutory right to pursue denial of benefits claims in a court before a jury."

## II.    Analysis

¶ 10    Freedom Life contends that (1) section 10-3-1116(3) cannot be applied because it is preempted by federal law, namely the FAA; (2) even if the FAA does not preempt the statute, the arbitration clause remains in effect for those claims that fall outside the statute; and (3) Ms. Meardon must arbitrate her claims to "exhaust her administrative remedies" under section 10-3-1116(3). It further

4

argues that even if, as a matter of contract law, the conformity clause operates to invalidate the arbitration clause, under FAA preemption rules, the arbitration clause prevails.

¶ 11    Ms. Meardon responds that the trial court correctly interpreted the conformity clause to invalidate the arbitration clause, and that even if FAA preemption would otherwise prohibit this operation of the conformity clause, reverse-preemption, a doctrine unique to statutes that regulate the insurance business, preempts FAA preemption (thus the term "reverse-preemption"). We proceed to separately address the effects of the conformity clause and the various preemption arguments and counterarguments.

### A.    Standard of Review and Legal Principles

¶ 12    We must interpret the policy and subsection 1116(3) to resolve this appeal. We review questions of statutory interpretation and insurance contract interpretation de novo. *Goodman v. Heritage Builders, Inc.*, 2017 CO 13, ¶ 5; *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002).

¶ 13    When we interpret a statute, we must ascertain and give effect to the legislature's intent. *Colo. Dep't of Revenue v. Creager Mercantile Co.*, 2017 CO 41M, ¶ 16. "We construe the entire

5

statutory scheme to give consistent, harmonious, and sensible effect to all parts," and "we give effect to words and phrases according to their plain and ordinary meaning." *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1089 (Colo. 2011). If a statute's language is clear, we apply it as written. *Id.* But "[i]f the statutory language is ambiguous, we may use other tools of statutory interpretation to determine the General Assembly's intent." *Id.*

¶ 14    Similarly, the words of an insurance policy "should be given their plain meaning according to common usage, and strained constructions should be avoided." *Allstate Ins. Co.*, 52 P.3d at 819. As pertinent here, "[b]ecause of the policy favoring arbitration, we construe any ambiguities [in the insurance policy] in favor of arbitration, and when an arbitration clause is broad or unrestricted, the strong presumption favoring arbitration applies with even greater force." *BFN-Greeley, LLC v. Adair Grp., Inc.*, 141 P.3d 937, 940 (Colo. App. 2006). "A valid and enforceable arbitration provision divests the courts of jurisdiction over all disputes that are to be arbitrated pending the conclusion of arbitration." *Mountain Plains Constructors, Inc. v. Torrez*, 785 P.2d 928, 930 (Colo. 1990).

6

## B. Conformity Clause

¶ 15   Parties to an insurance contract cannot agree to disregard statutory requirements. *See Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo. 1998) (examining a consent-to-sue clause in an insurance contract and explaining that "[p]arties may not privately contract to abrogate statutory requirements or contravene the public policy of this state"). To reflect this reality, Freedom Life elected to include a conformity clause in its insurance policy. The general effect of a conformity clause is to modify the contract to conform to the laws in the insured's state. *See* 2 Steven Plitt, Daniel Maldonado, Joshua D. Rogers & Jordan R. Plitt, *Couch on Insurance* § 19:3, Westlaw (3d ed. database updated Dec. 2017). A conformity clause can be triggered when an insurer is prohibited from, or required to, include a certain provision in the policy. *Id.* Thus, when an insurance policy contains a conformity clause, that clause amends the policy terms that conflict with state law. *See Traders & Gen. Ins. Co. v. Pioneer Mut. Comp. Co.*, 127 Colo. 516, 517-19, 258 P.2d 776, 777 (1953) (finding that a conformity clause requiring conformity to the motor vehicle financial responsibility law made the statute part of the insurance contract); *see also Peters v.*

*Time Ins. Co.*, No. 10-CV-02962-RPM, 2011 WL 2784291 (D. Colo. July 14, 2011) (unpublished opinion) (concluding that a conformity clause reformed the pre-existing condition exclusion in the insurance policy to conform with the state statute); *Burke v. First Unum Life Ins. Co.*, 975 F. Supp. 310, 316 (S.D.N.Y. 1997) (finding that policy's conformity clause "dictates that the policy be considered as if it contained the statutory language"); *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 802 (Minn. 2004) ("When an insurance policy contains a conformity clause, as Farmers' policies do, that clause amends all policy terms in conflict with Minnesota law to conform to those laws.").

¶ 16     Importantly, a predicate for operation of the conformity clause is a true conflict with state law.  A mere "difference" between the contract and state law is insufficient to trigger the conformity clause.  *See Grant Farms, Inc. v. Colo. Farm Bureau Mut. Ins. Co.*, 155 P.3d 537, 538 (Colo. App. 2006) ("A statute and [a] policy provision are not 'in conflict' merely because they are different from one another.").

¶ 17     As previously noted, subsection 1116(3) unambiguously entitles an insured to a de novo review in a court with jurisdiction,

and to a jury trial of denied claims.  In contrast, the operative language in the arbitration clause states that

> no **Disputes** arising between the parties shall be decided in Federal or State courts or before a judge or jury and the courts shall bar and dismiss any such attempted litigation.

¶ 18    In contrast, section 10-3-1116(3) provides

> An insurance policy, insurance contract, or plan that is issued in this state shall provide that a person who claims health, life, or disability benefits, whose claim has been denied in whole or in part, and who has exhausted his or her administrative remedies shall be entitled to have his or her claim reviewed de novo in any court with jurisdiction and to a trial by jury.

¶ 19    The plain words of the statute conflict with the mandatory arbitration clause: the statute guarantees to insureds such as Ms. Meardon a forum in court before a jury and the arbitration clause plainly prohibits such a lawsuit.[1]  This conflict triggered the policy's

---

[1] Freedom Life does not contend that Ms. Meardon may exercise her rights to a de novo trial after arbitration.  To the contrary, Freedom Life asserts that the mandatory arbitration clause *precludes* any court action by Ms. Meardon either before or after the completion of arbitration.  The dissent appears to concede that once arbitration is completed, Ms. Meardon has no right under the statute, or otherwise, to have her claims reviewed or decided in court, much less by a jury.

9

conformity clause.[2]  Application of the policy's conformity clause

results in the invalidation of the policy's arbitration clause.

Accordingly, as the trial court held, after operation of the conformity

clause, there was no arbitration clause to enforce.[3]

¶ 20    This conclusion, however, does not resolve all issues.

Freedom Life appears to argue that operation of the conformity

clause is itself preempted by the FAA.[4]  Put another way, Freedom

---

[2] Although not argued by the parties, we note that section 10-3-1116(3) actually requires that the insurance policy "shall provide" that a person who claims health benefits is entitled to de novo court review and jury trial.  Ms. Meardon's policy did not provide this review and is, thus, does not conform to the statute.

[3] Section 10-3-1116(3) expressly requires exhaustion of administrative remedies as a condition precedent to the exercise of the rights granted by the statute.  The parties do not address what, if any, administrative remedies, such as mediation, may remain, so we do not address whether Ms. Meardon has yet exhausted all of those remedies.  But, based on our analysis, arbitration is not an administrative remedy in this case, because it precludes judicial review.  These questions are for the trial court to determine on remand.

[4] We reject Freedom Life's argument that Ms. Meardon did not preserve the reverse-preemption argument in the trial court and is precluded from raising it on appeal.  As an appellee, Ms. Reardon may defend the trial court's judgment on any grounds supported by the record.  *See Atl. Richfield Co. v. Whiting Oil & Gas Corp.*, 2014 CO 16, ¶ 19 n.6 ("It is settled law that a respondent may defend the judgment of the trial court or the court of appeals on any ground supported by the record, so long as the party's rights are not

10

Life seems to say that a conformity clause can only operate to invalidate contract provisions that are in conflict with a *valid* state law and that section 10-3-1116(3) does not qualify because it conflicts with, and therefore is invalidated by, the FAA. We reject this argument because even if the operation of the conformity clause were so limited, FAA preemption is itself reverse-preempted by the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) (2012). That statute exempts state laws enacted for the purpose of regulating the insurance business from FAA preemption. The end result is that section 10-3-1116(3) is a valid statute notwithstanding the FAA, and the conformity clause operates to displace the arbitration clause.

¶ 21 Generally, to the extent a state law conflicts with the FAA, that state law is preempted by operation of the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2. *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). The United States Supreme Court repeatedly has ruled that, "[b]y enacting § 2 [FAA], we have several times said, Congress precluded States from singling out arbitration

increased under the judgment." (quoting *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 428 (Colo. 1991))).

11

provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' . . . The FAA thus displaces [state statutes] with respect to arbitration agreements covered by the Act." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

¶ 22 However, the McCarran-Ferguson Act provides a narrow exception to FAA preemption. It provides in relevant part as follows:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012(b).

¶ 23 Thus, the McCarran-Ferguson Act exempts a state law from FAA preemption if the state law is enacted for the purpose of regulating the business of insurance and if the federal statute — here the FAA — does not specifically relate to the business of insurance. *Allen v. Pacheco*, 71 P.3d 375, 382 (Colo. 2003); *see also* 21 *Williston on Contracts* § 57:178, Westlaw (4th ed. database updated July 2017) ("Because of McCarran-Ferguson . . . the

12

majority of courts have held that states may enact and enforce statutes that make mandatory arbitration agreements in insurance policies void or unenforceable in whole or in part.").

¶ 24 In *Allen,* 71 P.3d at 384, the Colorado Supreme Court recognized the effect of the McCarran-Ferguson Act on a health insurance statute that might otherwise be preempted by the FAA. *See* 71 P.3d at 384 (applying reverse-preemption to invalidate an arbitration clause in a health insurance contract that conflicted with the HCAA, § 13-64-403(3), (4), & (5), 5 C.R.S. 2002); *see also S. Pioneer Life Ins. Co. v. Thomas,* 385 S.W.3d 770, 774 (Ark. 2011) (finding that the McCarran-Ferguson Act precludes FAA preemption of a state statute regulating insurance); *Cont'l Ins. Co. v. Equity Residential Props. Tr.,* 565 S.E.2d 603, 605-06 (Ga. Ct. App. 2002) (holding that McCarran-Ferguson Act bars FAA preemption of a state statute that precludes insurance policy arbitration clauses); *Scott v. Louisville Bedding Co.,* 404 S.W.3d 870, 880 (Ky. Ct. App. 2013) (concluding that FAA did not preempt state statute exempting insurance contracts from arbitration); *Speece v. Allied Prof'ls Ins. Co.,* 853 N.W.2d 169, 174-75 (Neb. 2014) (validating a state statute enacted to regulate the insurance business under

reverse-preemption and concluding the FAA did not relate specifically to the insurance business).

¶ 25     Regarding the second and third requirements for reverse-preemption, Freedom Life does not argue that the FAA "relates to the business of insurance," or that subsection 1116(3) was *not* enacted for the purpose of regulating the business of insurance.  Any such arguments would be frivolous.[5]

¶ 26     We respectfully reject the dissent's analysis of section 10-3-1116(3) for three reasons.  First, because there is nothing ambiguous about that statute (and neither party has asserted that there is), we may not consider its legislative history.  *People v. Luther*, 58 P.3d 1013, 1015 (Colo. 2002).  The dissent bases most of its argument on its conclusion that the General Assembly did not intend to displace mandatory arbitration provisions.  But that is not the plain import of the words of the statute.

---

[5] At oral argument, Freedom Life presented a variation on the arguments it briefed.  It argued that under preemption principles, only a statute that by its express terms precludes arbitration can act to displace a mandatory arbitration agreement.  We do not address arguments made for the first time at oral argument.  *See Rucker v. Fed. Nat'l Mortg. Ass'n*, 2016 COA 114, ¶ 35.

¶ 27    Second, we find irrelevant the Employee Retirement Income Security Act (ERISA) cases on which the dissent relies.  This is not an ERISA case and whether the complexities of ERISA law affect the enforceability of section 10-3-1116(3) simply has no relevance to this case.

¶ 28    Third, we are concerned that the dissent's analysis transcends our obligation to decide the issues presented to us by the parties.  Indeed, Freedom Life concedes that "issues that do not appear in the record are not appropriate for consideration on appeal."  *See Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶ 18 ("It is axiomatic that issues not raised in or decided by a lower court will not be addressed for the first time on appeal."); *see also* Andrew Low, *Neither Briefed Nor Argued*, 38 Colo. Law. 87 (Sept. 2009).

### C.    Claims Subject to Arbitration

¶ 29    Freedom Life alternatively contends that only those claims covered by section 10-3-1116(3) are exempted from the arbitration clause and that the remaining claims must be arbitrated.  While this may be true, the parties did not seek a ruling from the trial court on this specific issue, but only argued the application of the

arbitration clause generally. Under these circumstances, we are unable to decide what claims are subject to the arbitration clause. *See Micciche v. Billings*, 727 P.2d 367, 373 (Colo. 1986) ("In the absence of a fully developed factual record and adequate findings of fact, however, we cannot determine whether that equitable doctrine should be applied here. We leave it to the hearing officer to resolve this issue on remand of the case."). Therefore, on remand the trial court must determine which claims are covered by section 10-3-1116(3) and which are not.

### III.    Conclusion

¶ 30      We affirm the court's order denying arbitration of those claims covered by section 10-3-1116(3). We remand the case for the trial court to decide which claims fall under section 10-3-1116(3) (and are exempt from arbitration), and which claims are subject to the policy's arbitration clause. The trial court retains substantial discretion to manage the claims subject to arbitration and those not subject to arbitration to avoid delays and unnecessary expense.

JUDGE BERGER concurs.

JUDGE BERNARD dissents.

JUDGE BERNARD, dissenting.

¶ 31    Aristotle wrote that, "[i]f you would understand anything, observe its beginning and its development."  It is my view that the key to this case is found in the origins of sections 10-3-1115 and -1116, C.R.S. 2017, which the legislature enacted in 2008.  Ch. 422, sec. 5, §§ 10-3-1115, -1116, 2008 Colo. Sess. Laws 2172-74.  After reviewing the ancestry of those two sections, I conclude that subsection 1116(3) does not void the arbitration clause in the policy in this case because the legislature did not intend that it should apply to arbitration clauses.  I therefore respectfully dissent.

¶ 32    As is pertinent to my analysis, section 10-3-1115 creates a duty.  Subsection 1115(1) prohibits an insurer from "unreasonably delay[ing] or deny[ing] . . . a claim for benefits owed to or on behalf of a first-party claimant."  Subsection 1115(2) states that a delay or denial of a claim is unreasonable if there was no "reasonable basis for [the] action."

¶ 33    Section 10-3-1116 provides the remedy for a breach of the duty established by subsection 1115(1).  Subsection 1116(1) provides that an insured "whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a

17

district court to recover reasonable attorney fees and court costs and two times the covered benefit." Subsection 1116(2) prohibits an insurance policy from "contain[ing] a provision purporting to reserve discretion to the insurer . . . to interpret the terms of the policy . . . or to determine eligibility for benefits."

¶ 34 Subsection 1116(3) concerns insurance policies that provide "health, life, or disability benefits." It states that, if an insurer has partially or completely denied a claim for such benefits, then those policies "shall provide" that an insured (1) who "has exhausted his or her administrative remedies"; (2) is "entitled to have his or her claim reviewed de novo in any court with jurisdiction and to a trial by jury." *Id.*

¶ 35 Where did these two statutes come from? I think that the answer to this question can be found in an ongoing controversy about something called a "discretionary clause."

¶ 36 Discretionary clauses often read something like this: "Insurer has full discretion and authority to determine the benefits and amounts payable [as well as] to construe and interpret all terms and provisions of the plan." John Morrison & Jonathan McDonald, *Exorcising Discretion: The Death of Caprice in ERISA Claims*

*Handling*, 56 S.D. L. Rev. 482, 483 (2011). These clauses became common in the early 1990s, *id.* at 482, after the United States Supreme Court decided *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), *see* Shawn McDermott, *CRS § 10-3-1116, ERISA Preemption, and the Standard of Review*, 39 Colo. Law. 75 (July 2010).

¶ 37    *Firestone Tire* addressed the following issue concerning health, life, or disability policies that were governed by the Employee Retirement Income Security Act, which is known as ERISA: What standard of review should a federal district court use when deciding whether an insurer had improperly denied benefits? The Supreme Court held that de novo review was the proper standard, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*, 489 U.S. at 115. But, if a health plan's language gives its administrator such discretionary authority, then federal district courts reviewing ERISA claims must apply the abuse of discretion standard to the administrator's decision to deny benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Firestone Tire*, 489 U.S. at 109, 115. The

difference between de novo review and deferential arbitrary and capricious review is meaningful. *See King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-1000 (8th Cir. 2005)(comparing de novo and abuse of discretion review of an administrator's decision).

¶ 38    The proliferation of discretionary clauses caught the attention of the National Association of Insurance Commissioners. The Commissioners were bothered by what they perceived as a conflict of interest that arose when "the claims adjudicator [— who is often the plan's administrator —] is also the insurer that pays the benefit." McDermott, 39 Colo. Law. at 75. So, in 2002, they drafted a model act, which was entitled "Prohibition on the Use of Discretionary Clauses Model Act." Joshua Foster, Note, *ERISA, Trust Law, and the Appropriate Standard of Review: A De Novo Review of Why the Elimination of Discretionary Clauses Would Be an Abuse of Discretion*, 82 St. John's L. Rev. 735, 744-45 (Spring 2008). The model act showed state legislatures how to pass laws that prohibited discretionary clauses in health insurance contracts. *Id.*

¶ 39　　As of 2015, almost twenty-five states had either banned or limited discretionary clauses in health insurance policies governed by ERISA, or they were in the process of doing so. *Owens v. Liberty Life Assurance Co.*, 184 F. Supp. 3d 580, 584 (W.D. Ky. 2016). The means to effect the ban or the limitation varied, including statutes, administrative rules, or interpretations issued by a state's insurance commissioner. McDermott, 39 Colo. Law. at 76.

¶ 40　　Colorado was one of those twenty-five states. *Id.*; Radha A. Pathak, *Discretionary Clause Bans & ERISA Preemption*, 56 S.D. L. Rev. 500, 504 n.30 (2011); Morrison & McDonald, 56 S.D. L. Rev. at 488 nn.44-45. The means that it chose to ban discretionary clauses was statutory, in the form of subsections 1116(2) and 1116(3). McDermott, 39 Colo. Law. at 76. More specifically, subsection 1116(2) banned the discretionary clauses, and subsection 1116(3) made it clear that a court reviewing an insurer's decision to deny an insured's benefits must apply the de novo standard.

¶ 41　　But what about the reference to a right to a jury trial in subsection 1116(3)? At least eight federal circuit courts of appeal, including the Tenth Circuit, have held that insureds who file claims

for ERISA benefits are not entitled to jury trials because their claims are equitable in nature. *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1355-57 n.5 (10th Cir. 2009)(collecting cases); *see also* McDermott, 39 Colo. Law. at 79 ("[Federal] [t]rials to the court in ERISA cases are rare. Jury trials do not exist."). It is therefore obvious to me that subsection 1116(3) was designed to avoid the federal prohibition of jury trials. It instead gave an insured a right to a jury trial in state court when he or she filed a claim under subsection 1116(1), which alleged that the plan administrator had unreasonably denied or delayed a claim for benefits. *See* McDermott, 39 Colo. Law. at 79 (Subsection 1116(3) "specifically included the right of an ERISA claimant to a jury trial.").

¶ 42    (I note that there is an open question whether ERISA preempts subsection 1116(3)'s jury trial right. *See Shafer v. Metro. Life Ins. Co.*, 80 F. Supp. 3d 1244, 1255-57 (D. Colo. 2015)(concluding that ERISA preempted subsection 1116(3) in its entirety because the statutory jury trial right "undermine[d]" ERISA by "inhibit[ing] prompt adjudication by the judiciary."). But I do not need to cross

22

this bridge to conclude that subsection 1116(3) did not void the arbitration clause in this case.)

¶ 43 Based on this background, I think that our legislature intended subsections 1116(2) and (3) to change the standard of reviewing an insurer's decision to deny benefits from abuse of discretion review to de novo review and the identity of the entity reviewing that decision from a court to a jury. *See Lewis v. Taylor*, 2016 CO 48, ¶ 20 ("The primary goal of statutory interpretation is to ascertain and give effect to the legislature's intent."); 2A Norman J. Singer & Shambie Singer, *Sutherland Statutes and Statutory Construction* §§ 48.3 (7th ed. 2014) ("Courts look to a statute's contemporary history and historical background as aids to interpretation. . . . [C]ourts generally turn to a law's pre-enactment history to discover its purpose, or object, or the mischief at which it was aimed, when the statute's language is inadequate to reveal legislative intent. . . . Courts discussing an act's legal history usually are speaking more specifically about prior statutes on the same subject, and recent statutes on similar subjects, and the case law interpreting such legislation." (footnotes omitted)). The

subsections did not have anything to do with voiding arbitration clauses.

¶ 44     For the following reasons, I conclude that the plain language of subsections 1116(2) and (3) supports my view of the legislature's intent. *See Lewis*, ¶ 20 (To determine the legislature's intent, "we look to the plain meaning of the statutory language and consider it within the context of the statute as a whole.").

¶ 45     First, neither subsection includes the words "arbitrate" or "arbitration." And courts do not add language to statutes when interpreting them. *See Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo. 2005)("We will not create an addition to a statute that the plain language does not suggest or demand."); *Carruthers v. Carrier Access Corp.*, 251 P.3d 1199, 1204 (Colo. App. 2010)("[W]e will not interpret a statute to mean that which it does not express.").

¶ 46     The legislature knows how to modify or invalidate arbitration clauses if it wants to do so. *See* § 13-64-403(1), C.R.S. 2017 ("It is the intent of the general assembly that . . . no medical malpractice insurer shall require a health care provider to utilize arbitration agreements as a condition of providing medical malpractice insurance . . . ."); *see also Allen v. Pacheco*, 71 P.3d 375, 384 (Colo.

24

2003)("Because the agreement here does not comply with sections 13-64-403(3) and (4) . . . the agreement is unenforceable and [the plaintiff] is not required to submit her wrongful death claim to binding arbitration."). The legislature's silence about arbitration in subsection 1116(3) is therefore more than deafening; it is clear proof that the legislature did not intend the subsection to void arbitration clauses.

¶ 47     Second, Colorado favors arbitration. *See Meister v. Stout,* 2015 COA 60, ¶ 10; *BFN-Greeley, LLC v. Adair Grp., Inc.,* 141 P.3d 937, 940 (Colo. App. 2006). And a broad or unrestricted arbitration clause, such as the one in this case, gives greater force to the presumption in favor of arbitration. *See Meister,* ¶ 10.

¶ 48     Third, the phrase "has exhausted his or her administrative remedies" that appears in subsection 1116(3) indicates to me that an insured *must* go through whatever arbitration process the policy requires before he or she may even consider filing a lawsuit. In *Timm v. Prudential Insurance Co. of America,* 259 P.3d 521, 529 (Colo. App. 2011), the division stated that "[a]n ERISA cause of action generally accrues when a plan administrator denies a claim for benefits. A participant must therefore generally exhaust

25

administrative remedies before seeking judicial relief." (Citation omitted.) This statement was based on a citation to *Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir. 1990), which referred to a "*[p]lan's* administrative remedies." (Emphasis added.)

¶ 49 Federal courts have included arbitration within the class of administrative remedies that must be exhausted. "[I]f the plan contains an arbitration clause, the plaintiff must arbitrate the dispute in accordance with the clause in order to exhaust his administrative remedies before filing suit in federal court." *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000); *accord Kilkenny v. Guy C. Long, Inc.*, 288 F.3d 116, 122 (3d Cir. 2002)("Under ERISA, internal administrative remedies like the arbitration procedures mandated in . . . labor agreements must be exhausted prior to bringing suit in federal court."); *Int'l Molders & Allied Workers Union, AFL-CIO, CLC v. Aquarius Shoe Corp.*, 511 F. Supp. 361, 363 (E.D. Mo. 1981); 15 Steven Plitt, Daniel Maldonado, Joshua D. Rogers, & Jordan R. Plitt, *Couch on Insurance* § 210:22, Westlaw (3d ed. database updated Dec. 2017)("In keeping with the general ERISA requirement of exhaustion of administrative

26

remedies, the litigation to date has favored enforcement of arbitration agreements pertinent to ERISA-governed welfare benefit plans . . . in the context of agreements . . . appearing in employer-sponsored plans.") (footnote omitted).

¶ 50 The policy in this case describes three levels of administrative remedies: negotiation, mediation, and binding arbitration. The first two administrative remedies do not bar a subsequent lawsuit. As a result, if those were the only two administrative remedies in the policy, Ms. Meardon would be entitled, under subsection 1116(3), "to have . . . her claim reviewed de novo in any court with jurisdiction and to a trial by jury."

¶ 51 But those are not the only administrative remedies. I conclude that, not only do the policy *and* subsection 1116(3) require Ms. Meardon to submit to binding arbitration, but Ms. Meardon cannot file a lawsuit after the arbitral process is over because the arbitration is *binding* arbitration.

¶ 52 In other words, subsection 1116(3) is conditional, rather than categorical. *If* insureds are able to file lawsuits concerning the insurers' decisions to deny benefits after exhausting the policy's administrative remedies, then juries will review their claims de

27

novo. *But* they might be unable to file lawsuits because of binding arbitration clauses in their policies.

¶ 53    This reading of subsections 1116(2) and (3) renders the policy's conformity clause irrelevant for the purposes of this discussion. Because the legislature did not intend subsection 1116(3) to void arbitration clauses, the conformity clause cannot void the arbitration clause in this case. *See Grant Farms, Inc. v. Colo. Farm Bureau Mut. Ins. Co.*, 155 P.3d 537, 538 (Colo. App. 2006)("A statute and [a] policy provision are not 'in conflict' merely because they are different from one another.").

¶ 54    The majority rejects the preceding analysis of subsection 1116(3) for three reasons. I respectfully disagree with each of them.

¶ 55    *Reason one: I should not consider the ancestry of subsection 1116(3) because "there is nothing ambiguous about" the subsection and because "neither party has asserted that there is."*

¶ 56    The majority and I reach different conclusions about what subsection 1116(3) means. For example, the majority concludes that the "plain words of [subsection 1116(3)] conflict with the mandatory arbitration clause." *Supra* ¶ 19. I conclude that subsection 1116(3) does not apply to arbitration clauses at all. Part

of my analysis is based on the absence of any reference to arbitration in subsection 1116(3), and I think that this lacuna is outcome determinative.

¶ 57    Making the fair assumption that both the majority's interpretation and my interpretation of subsection 1116(3) are reasonable, the difference between them starkly illustrates the ambiguity that the majority concludes does not exist. *See Vensor v. People*, 151 P.3d 1274, 1277 (Colo. 2007)("If statutory language is susceptible of more than one reasonable interpretation, it is considered ambiguous and subject to construction according to well-accepted aids for determining legislative intent.").

¶ 58    Two well-accepted tools for construing ambiguous statutes are "examining the legislative intent[] [and] the circumstances surrounding [the statute's] adoption . . . ." *Coffman v. Williamson*, 2015 CO 35, ¶ 23 (quoting *Williams v. Kunau*, 147 P.3d 33, 36 (Colo. 2006)). Decisions from courts in other jurisdictions may assist in determining legislative intent when they discuss similar statutes. *See Mosley v. Indus. Claim Appeals Office*, 119 P.3d 576, 579 (Colo. App. 2005)("Courts from other states have almost uniformly concluded that the language and purpose of their states'

29

[statute], which are identical to Colorado's, demonstrate the legislatures' intent . . . ."). More specifically, when dealing with an adaptation of a model act, as we are in this case, we can look to the intent of the drafters of the model act when trying to ascertain the intent of our legislature. *See Copper Mountain, Inc. v. Poma of Am., Inc.*, 890 P.2d 100, 106 (Colo. 1995). And we may consider the object that the statute seeks to attain, its legislative history, the common law, and the consequences of a particular construction of the statute. § 2-4-203(1)(a), (c)-(e), C.R.S. 2017.

¶ 59    *Reason two: The discussion of ERISA cases is irrelevant because this is not an ERISA case.*

¶ 60    It does not matter that this case is not an ERISA case. As I have already explained, subsection 1116(3) arose *out of* ERISA cases. Those cases are therefore helpful in deciding what subsection 1116(3) means, and that meaning spills over to non-ERISA cases.

¶ 61    More particularly, the ERISA precedent is especially instructive because insureds may file cases involving specified ERISA issues in Colorado state courts concerning their health, life, or disability policies. "State courts . . . and district courts of the

United States shall have concurrent jurisdiction" over lawsuits filed by a participant or beneficiary in a qualifying plan "to recover benefits due . . . under the terms of [a] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B), (e)(1) (2012); *see also Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 n.2 (9th Cir. 1984)("Jurisdiction over actions . . . to recover benefits or enforce rights under a plan . . . is vested concurrently in state and federal courts.").

¶ 62    *Reason three: My "analysis transcends [the division's] obligation to decide the issues presented to us by the parties."*

¶ 63    The question whether subsection 1116(3) voids arbitration clauses in certain insurance policies has always been front and center in this case.  The trial court concluded that,

> by requiring health insurance policies issued in Colorado to provide for litigation of claim denials, [subsection 1116(3)] effectively forbids mandatory arbitration clauses in such policies, and confers specifically upon life, health, and disability policyholders the statutory right to pursue denial of benefits claims in court before a jury.  The arbitration clause in [Ms. Meardon's] policy is in conflict with [subsection 1116(3)].  It is, therefore, unenforceable and

31

automatically amended by its own terms" [in the policy's conformity clause].

¶ 64     What the reader has already encountered in this dissent responds directly to the trial court's ruling by explaining why subsection 1116(3) does not "effectively forbid[] mandatory arbitration clauses . . . ." *See Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶ 18 ("It is axiomatic that issues not raised in or *decided by* a lower court will not be addressed for the first time on appeal.") (emphasis added).

¶ 65     In conclusion, I do not think that subsection 1116(3) voided the arbitration clause in this case because (1) the subsection's language does not refer to arbitration; and (2) the legislature did not intend that it would have such an effect. I would therefore reverse the trial court's order denying Freedom Life's motion to compel arbitration, and I would remand this case to the trial court to grant that motion and then to dismiss this case.